NEW ENGLAND PETROLEUM
CORPORATION, Plaintiff,

v.

FEDERAL ENERGY ADMINISTRATION
and Frank G. Zarb, as Administrator of
the Federal Energy Administration, De-
fendants,

and

Exxon Corporation,
Intervenor-Defendant.

No. 75 Civ. 6011–CSH.

United States District Court,
S. D. New York.

March 23, 1978.

See also, D.C., 71 F.R.D. 454.

White & Case, Washington, D. C. and New York City (Charles N. Brower, Andrew T. H. Munroe, Emil T. Bayko, Washington, D. C., of counsel), for plaintiff.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City (Walter S. Mack, Jr., Asst. U. S. Atty., New York City, Robert Heiss, Senior Atty. Adviser, Dept. of Energy, Washington, D. C., of counsel), for defendants Federal Energy Administration and Frank G. Zarb.

Benjamin T. Richards, Jr., Counsel, New York City, Covington & Burling, Washington, D. C., for Exxon Corp.; (William H. Allen, Donald Harrison, Washington, D. C.), D. Joseph Potvin, Houston, Tex., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiff New England Petroleum Corporation ("NEPCO") commenced this action against defendants Federal Energy Administration and its Administrator Frank G. Zarb (collectively "FEA") to review four initial FEA orders, and three FEA final orders affirming the initial orders on administrative appeal. The orders under review relate to the FEA's granting in part, and denial in part, of exceptions relief requested by NEPCO within the context of the Old Oil Entitlements Program. 39 F.R. 42246, December 4, 1974; 10 C.F.R. § 211.-67. NEPCO's second amended complaint, filed on September 27, 1976, specifies twelve separate claims for relief arising out of the FEA orders. NEPCO prays for a declaratory judgment under 28 U.S.C. § 2201, and further necessary or proper

relief under 28 U.S.C. § 2202. Jurisdiction is predicated upon the Federal Energy Administration Act of 1974, 15 U.S.C. § 761 et seq., and in particular 15 U.S.C. § 766 and § 767; upon the Emergency Petroleum Allocation Act, 15 U.S.C. § 751 et seq.; and upon the provisions of 28 U.S.C. § 1331. Venue is had in this Court under 28 U.S.C. § 1391(e)(4), NEPCO's principal place of business being New York, New York.

This Court granted the motion of Exxon Corporation ("Exxon") pursuant to Rule 24, F.R.Civ.P., to intervene as an additional party defendant. 71 F.R.D. 454 (S.D.N.Y. 1976).

The case now comes before the Court on cross motions for summary judgment pursuant to Rule 56. NEPCO contends that it is entitled as a matter of law to greater exceptions relief than that granted by FEA. FEA defends the partial relief granted and the denial to NEPCO of further entitlements. Exxon, as an alternative basis for dismissal of NEPCO's complaint, contends that FEA lacked statutory authority to grant NEPCO any relief. That contention provoked FEA to urge, following submission of Exxon's motion papers, that the Court strip Exxon of its status as intervenor, a sanction which NEPCO endorses.

Since October, 1977, the action has been defended by the Department of Energy, the statutory successor to the FEA (see fn. 100 infra). The following continues references to the FEA.

The Court grants the motions for summary judgment of NEPCO and the FEA in part, denies them in part, and remands the case to the Department of Energy. Exxon's motion for summary judgment dismissing the complaint is denied.

## I.

### FACTUAL BACKGROUND

A. *The Old Oil Entitlements Program*

The genesis of the Old Oil Entitlements Program was referred to in this Court's prior opinion, 71 F.R.D. at 456–457, and has been more authoritatively considered by the Temporary Emergency Court of Appeals ("T.E.C.A.") in *Pasco, Inc. v. FEA*, 525 F.2d 1391 (Em.App.1975), *Cities Service Co. v. FEA*, 529 F.2d 1016 (Em.App.1975), *cert. den.*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184, and *Delta Refining Co. v. FEA*, 559 F.2d 1190 (Em.App.1977). In *Delta Refining Co.* the T.E.C.A., quoting in turn the FEA's definition of the program, describes the source from which the present litigation springs:

"In January 1974, pursuant to authority granted it by the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq., the Federal Energy Office (FEO) issued comprehensive regulations to control the allocation and price of crude oil (10 C.F.R. §§ 210–211 (1974)). These regulations instituted a 'two-tiered' system whereby a low price was imposed on 'old' crude oil but 'new' crude oil (newly discovered oil and oil produced above 1972 production levels from the same property) was exempted from controls.

"In December 1974, to ameliorate the competitive disadvantages among refiners caused by the two-tiered pricing system and by unequal access by refiners to price-controlled 'old' oil, FEO's successor, the Federal Energy Administration (FEA), promulgated the Old Oil Entitlements Program. (39 F.R. 42246, December 4, 1974.) As the FEA defines its program:

'The Entitlements Program is designed to remedy the economic distortion created by an unequal distribution of low cost, price controlled old crude oil among domestic refiners, and is implemented by the issuance each month of entitlements to each domestic refiner on the basis of each refiner's volume of crude oil runs to stills. An entitlement is defined as the right of a refiner owning the entitlement to include one barrel of old oil in its adjusted crude oil receipts in a particular month. (10 C.F.R. 211.63.) Under the program, a refiner is issued a sufficient number of entitlements to assure it an old oil supply ratio equal to the adjusted national old oil supply ratio.

'A refiner which has old oil receipts in excess of its entitlements in a particular month is required to purchase a number of entitlements equal to that excess amount. Similarly, a refiner with a number of old oil receipts which is less than the number of its entitlements in a particular month is required to sell those excess entitlements. The price at which entitlements must be sold is fixed each month by the FEA.'" 559 F.2d at 1191.

## B. Impact of the Old Oil Entitlements Program Upon the United States East Coast Market

As noted, the purpose of the Old Oil Entitlements Program was "to ameliorate the competitive disadvantages among refiners caused by the two-tiered pricing system and by unequal access by refiners to price-controlled 'old' oil", Delta Refining Co., supra. However, in one marketing area of the nation, the operation of entitlements program and an earlier FEA program caused substantial and unwanted market distortions. That area was the East Coast.

As the petroleum industry has developed over the years, the East Coast residual fuel oil market has been supplied for the most part by Caribbean refineries dependent upon foreign crude oil. It appears to be common ground that at the pertinent times, Caribbean imports accounted for 80–90 percent of total sales in that market; and that five companies predominated in the market. Those companies, with their respective market percentage shares during the first nine months of 1974,[1] were: Exxon, XX.XX *

percent; Asiatic Petroleum Corp., XX.XX percent;[2] Amerada Hess, XX.XX percent; NEPCO, XX.XX percent; and Texaco, Inc. X.XX percent.

Amerada Hess owns a refinery in the U. S. Virgin Islands. This is significant because, in consequence, Amerada Hess qualified as a domestic refiner under FEA programs.[3] None of the four competing companies so qualified. NEPCO did not because the Caribbean refinery in which it has a proprietary interest is located at Freeport, the Bahamas.[4]

As a domestic refiner, Amerada Hess participated to its benefit in the Old Oil Entitlements Program. It also benefited from participation as a "refiner buyer" in a previously established FEA device, the Mandatory Crude Oil Sales ("Buy/Sell") Program, 10 C.F.R. § 211.65, under which certain domestic, "independent" refiners were entitled to purchase quantities of price-controlled old oil from other domestic, major integrated refiners. Hess became a purchaser of "old oil" under this program when the program was amended on June 1, 1974; previously Hess had been a net seller.

The effect of Amerada Hess' exclusive participation in these programs was to give that company a pronounced advantage over its four rivals in the East Coast market. Such participation served to offset Hess' high foreign crude oil costs. Its competitors in the East Coast residual fuel oil market—Exxon, Asiatic Petrolum, NEPCO, and Texaco—had no such offsets available to them.

---

1. The market percentages are based on Table 2 to NEPCO's initial presentation to FEA. See Certified Administrative Record ("Rec.") at 1732; see also Exxon main brief at 9, FEA main brief at 11.

* Material contained in the original court opinion which is arguably confidential under 18 U.S. C.A. § 1905 has been deleted by the Judge and replaced by x's.

2. Asiatic Petroleum, affiliated with the Shell interests, is designated as "Shell" in the NEPCO presentations.

3. Section 4(a) of the Emergency Petroleum Allocation Act, 15 U.S.C. § 753(a), provides that the regulations with which this litigation is concerned "shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in and imported into the United States." Section 3(7) of the Act, 15 U.S.C. § 752(7), defines "the United States" as "the States, the District of Columbia, Puerto Rico, and the territories and possessions of the United States".

4. NEPCO owns a 65 percent interest in the refinery, and Standard Oil of California the remaining 35 percent. Complaint, ¶ 7.

As the administrative record makes clear, there was widespread industry dissatisfaction with the advantage bestowed upon Amerada Hess by operation of the FEA programs. However, NEPCO took the position that it was uniquely and adversely affected by the operation of those programs in the East Coast market. That was because NEPCO, and NEPCO alone, imported residual fuel oil from a Caribbean refinery, but enjoyed neither a crude oil supply of its own—in contrast to Exxon, Asiatic Petroleum, and Texaco—nor access to price-controlled old oil under the FEA programs—in contrast to Amerada Hess.[5]

This perceived state of affairs prompted NEPCO in February of 1975, to apply to the FEA for exceptions relief. NEPCO sought, in short, to participate itself in the entitlements program. The opinions and orders the FEA issued in response to that initial request and its successors form the subject matter of this action. They are considered in detail *supra*. It is sufficient for these introductory purposes to state that, at hearings held by the FEA to consider NEPCO's requests, others involved in the industry were critical of the Amerada Hess advantage, but opposed to NEPCO's requested relief. At times during the hearings it was difficult to tell which irritated a particular spokesman more: Amerada Hess' participation in the FEA programs, or NEPCO's efforts to be relieved from the consequences of Hess' participation by participation of its own.

Throughout the NEPCO opinions and orders the FEA manifested awareness and concern in respect of the East Coast residual fuel oil market. That concern led, in April of 1976, to an amendment of the Old Oil Entitlements Program, so as to (1) reduce by 50 percent the entitlements earned by Hess and other domestic refiners on their residual fuel oil sold in the East Coast market; and (2) grant 30 percent entitlement benefits with respect to residual fuel oil imports into the East Coast markets, other than imports from the U. S. Virgin Islands and Puerto Rico. 41 Fed.Reg. 13899–14000 (April 1, 1976). The effect of these amendments was limited to the East Coast market, since the FEA was specifically addressing the "competitive imbalance in the East Coast residual fuel oil market" caused by the participation of Amerada Hess in the entitlements program, 41 Fed. Reg. 13899 (April 1, 1976), and "this is the only area of the country experiencing substantial market distortions caused by the operation of the entitlements program." *Id.* at 14000. Enactment of these amendments "obviated further need to issue individual exceptions relief to NEPCO",[6] and as will appear, NEPCO has made no claim for such relief subsequent to March of 1976.

Against this factual background, the Court considers the several NEPCO requests and their disposition by FEA.

## II.

## THE NEPCO REQUESTS AND THE FEA RULINGS

While each NEPCO request and responsive FEA ruling is considered separately *supra*, it may prove useful to summarize them here. Essentially there were five applications. Following the FEA's terminology, they will be referred to throughout as NEPCO I, NEPCO II, NEPCO III, NEPCO IV, and NEPCO V.

### NEPCO I[7]

In its initial application, filed on February 27, 1975,[8] NEPCO described the then existing East Coast market conditions, with particular reference to the advantage enjoyed by Amerada Hess as the result of participation in the FEA Buy/Sell and Old Oil Entitlements programs, and the eco-

---

5. See allegations in NEPCO complaint at ¶¶ 44, 45, and attached exhibits.

6. FEA main brief at 12.

7. Case No. FEE–1513 (filed 2–27–75, decided 5–2–75), 2 FEA ¶ 83,136; order affirmed on administrative appeal, Case No. FEA–0461 (decided 8–7–75), 2 FEA ¶ 80,648.

8. Rec. 0005–0058.

nomic impact of that advantage upon NEP-CO. NEPCO submitted financial statements purporting to show that whereas in 1973 it had a profit before taxes on a consolidated basis of $XX.X million, in 1974 "NEPCO suffered a financial disaster with losses on a consolidated basis of $XX.X million." [9] That poor result in 1974 and "continuing severe losses" in 1975 were ascribed by NEPCO to "the interplay of a number of factors, prominent among them the discriminatory impact of the Crude Oil Buy/Sell Program and the Old Oil Entitlements Program.[10] NEPCO stated that "it cannot continue as a viable competitor without relief from FEA . . ."[11] Specifically, FEA was asked to characterize NEPCO as a refiner-buyer in the Buy/Sell Program as of June 1, 1974, and as a domestic refiner, at least for its share of its Bahamas refinery output for United States destinations, in the Entitlements Program from November 1, 1974.[12] Such relief, if granted, would of course have been both retroactive and prospective.

The FEA requested and obtained further data from NEPCO, as well as comments from other concerned companies such as Asiatic Petroleum and Exxon. On May 2, 1975 the FEA filed its decision and order.[13] The decision rejected NEPCO's requested relief, but granted limited relief. Specifically, NEPCO was granted an exception to the provisions of 10 C.F.R. § 211.67 (governing the entitlements program and pursuant to which NEPCO was not entitled to participate in it), to the extent that NEPCO was permitted to earn entitlements on residual fuel imports up to a maximum of 3,000,000 barrels per month, adjusted for supplemental import fees. This exception relief was limited in time to the period May 1, 1975, to July 31, 1975; in other words, NEPCO

could claim entitlements for the months of May, June and July, 1975. NEPCO was directed to submit further financial and related data to FEA on or before July 10, 1975. The order further provided that, "on the basis of that submission and the principles set forth in this Decision and Order",[14] NEPCO could if it chose request an extension of the exception relief beyond July, 1975. Thus was the seed sown for what became NEPCO II.

NEPCO filed an administrative appeal, pursuant to 10 C.F.R. Part 205, Subpart H, from the FEA's denial of the full relief requested in its application. The appeal decision and order,[15] denied NEPCO's appeal in all respects. That order was certified a "final order of the Federal Energy Administration of which an aggrieved party may seek judicial review." [16]

NEPCO sought no judicial review of NEPCO I, either at that time or in these proceedings. Nevertheless, NEPCO I is of central significance to the case at bar because the FEA's rationale, underlying NEPCO I, runs like a leitmotif throughout its subsequent decisions, shaping and explaining them. It is necessary therefore to consider that rationale in some depth.

The FEA concluded in NEPCO I that, on the basis of as yet unaudited 1974 figures, NEPCO had demonstrated that "a serious hardship exists with respect to NEPCO which warrants exception relief." [17] As NEPCO had contended, the FEA found that the benefits enjoyed by Amerada Hess in the FEA programs contributed directly to NEPCO's distress. The decision observes:

"Although Hess did enjoy a cost advantage over NEPCO prior to the promulga-

---

9. Rec. 0025.

10. *Ibid.*

11. Rec. 0057.

12. Rec. 0013–0015.

13. Rec. 1728–1742.

14. Rec. 1742.

15. Rec. 1809–1817.

16. Rec. 1817.

17. Rec. 1736. The phrase "serious hardship" echoes the regulations, 10 C.F.R. § 205.50(a), which permit exception relief where "serious hardship or gross inequity" are established. See Point V–A, *infra.*

tion of the Entitlements Program since Hess was permitted to purchase substantial quantities of crude oil under the FEA's Buy-Sell Program from major oil companies at their weighted average cost of crude oil plus thirty cents per barrel and certain adjustments, that advantage has been substantially increased as a result of the Entitlements Program. The competitive advantage which Hess enjoys has also been stabilized as a result of the Entitlement Program which generally equalized the price of crude oil which domestic refiners utilize at a price below the world market price.

"Based on the submissions which NEPCO has made in support of its exception request, it is apparent that the firm's ability to remain a viable independent competitor will be substantially endangered in the absence of exception relief. NEPCO has been in existence for the past twenty-eight years and during that period of time has developed its business enterprise to the point where it has become a strong, major competitor in the residual fuel oil market. For the three year period of 1971 to 1973 NEPCO has steadily increased its sales of residual fuel oil and achieved a net operating profit. This situation however changed dramatically subsequent to the promulgation of the FEA Old Oil Entitlements Program. As a direct result of the advantage which its major competitor received through benefits provided under the FEA regulations, NEPCO expects that it will sustain a significant loss in market share in 1975 and further expects to incur a $XX mil-

lion operating loss during 1975. The financial data which NEPCO submitted to the FEA certainly supports the firm's contention that it will not be able to continue to maintain its business operations in residual fuel oil if it continues to sell products at a price which is substantially below the price which it pays for purchasing the raw material alone. An indefinite continuation of the present market environment which is in substantial part a result of the FEA Old Oil Entitlements Program will therefore likely result in the dissolution of NEPCO's residual fuel oil activities and its elimination from its previous historic position as a strong competitor in that market." Rec. 1736.

In the FEA's view, "the loss of NEPCO as a competitive force in the residual fuel oil market would certainly tend to frustrate" [18] Congressional policy objectives that the FEA and its regulations "to the maximum extent practicable", preserve a competitive petroleum industry, including the competitive inability of independent marketers. The FEA had particularly in mind the statements of purpose which appear in Section 4(b)(1) of the Energy Petroleum Allocation Act of 1973, 15 U.S.C. § 753(b)(1),[19] and Section 18(a) of the Federal Energy Administration Act of 1974, 15 U.S.C. § 777(a).[20] These two statutes, which are the root sources of the agency, its programs, and this litigation,[21] will be referred to throughout as the "EPA Act" and "FEA Act" respectively.

---

18. Rec. 1737.

19. The statute provides that regulations promulgated pursuant to it:

". . . to the maximum extent practicable, shall provide for— . . .

"(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers; . . ."

20. The statute provides that:

"(a) In carrying out the provisions of this chapter, the Administrator shall, to the greatest extent practicable, insure that the potential economic impacts of proposed regulatory and other actions are evaluated and considered, including but not limited to an analysis of the effect of such actions on— . .

"(8) competition in all sectors of industry; . . . ."

21. See *Delta Refining Co., supra*, at 559 F.2d 1191.

While prepared on the basis of NEPCO's threatened dissolution to extend some exceptions relief, the FEA declined to award the full relief requested. The agency reasoned that the granting of such relief would place NEPCO on a par with *domestic refiners* under the Buy/Sell and Entitlements Programs, a status which the FEA regarded as contrary to Congressional intent and therefore inappropriate for a company whose refinery was "located in a foreign country", namely the Bahamas. It was NEPCO's status as a *domestic marketer* of refined petroleum products that moved the FEA to grant a "certain degree of special protection" under the statutes. The FEA reasoned thus:

"However, NEPCO has not made a convincing showing that the relief which it seeks is either necessary or appropriate. The specific relief requested by NEPCO, if granted, would permit it to receive virtually the same benefits that domestic refiners enjoy as a result of certain FEA programs. In providing that the regulations promulgated by the FEA 'shall apply to all crude oil, residual fuel oil, and refined petroleum products *produced in or imported into the United States*' (EPAA, Section 4(a); emphasis added), and in defining the United States to mean 'the States, the District of Columbia, Puerto Rico, and the territories and possessions of the United States' (EPAA, Section 3(7)), the Congress clearly did not intend that refineries located outside of the United States receive the same benefits under FEA programs as domestic refineries. It is therefore not appropriate that the NEPCO refinery which is located in a foreign country be treated as if it were located in the United States as that term is defined in the EPAA.

"However, as a domestic marketer of refined petroleum products NEPCO is entitled to a certain degree of special protection under the EPAA and FEAA with respect to those marketing activities. In view of the showing which NEPCO has made that it is incurring a serious hardship and in view of the competitive position which it occupies with respect to residual fuel oil it is therefore appropriate that NEPCO be granted exception relief which will mitigate the adverse affect to NEPCO which accrues as a result of the benefits which its principal competitor receives under the Entitlements Program. Appropriate relief to achieve this objective can be best implemented by permitting NEPCO to earn entitlements on its residual fuel oil imports up to a maximum of 3,000,000 barrels a month, adjusted for supplemental import fees." Rec. 1738.

This relief, limited in quantity by the 3,000,000 barrel maximum, the FEA also limited in time to three months. That limitation reflected the agency's recognition of the particular market problem involved, and its intent to study it further. The agency stated:

"In approving exception relief in this case the FEA recognizes that the current market situation in residual fuel oil in the eastern United States is volatile and that further study is warranted with respect to the impact on the entire competitive situation as a result of the benefits which Amerada Hess presently enjoys. That study will be initiated immediately. Consequently, the exception relief which has been approved for NEPCO is limited in duration to no more than three months. Moreover, the relief provided is subject to change on the basis of other general regulatory action which the FEA may take." Rec. 1738.

The FEA denied NEPCO retroactive relief because, in its view, NEPCO had not proceeded in timely fashion to seek relief; and it had "made no showing that retroactive exception relief is essential in order to preserve its continued viable operations in the residual fuel oil market," Rec. 1739.

NEPCO prosecuted an administrative appeal, which particularly addressed the denial of retroactive relief, and the subtraction of the supplemental import fee differential in the formula for relief. NEPCO nowhere criticized the "serious hardship or gross inequity" standard contained in the regulations, 15 C.F.R. § 205.50, in respect of exception relief.

The administrative appeal decision and order, dated August 7, 1975, affirmed the initial order. The appeal decision reiterated the distinction between NEPCO as *foreign refiner* (and thus disentitled to parity with domestic refiners) and *domestic marketer* (thus entitled to "a certain degree of special protection").[22] The appeal decision's discussion of the limited relief awarded NEPCO is significant because it restates and clarifies the rationale underlying the agency's response to NEPCO's situation:

"NEPCO's final argument addresses certain alleged deficiencies in the formula for computing the value of entitlements issued pursuant to the May 2, 1975 Order. NEPCO's argument in this regard is premised on the assumption that the reason for subtracting the difference between the supplemental import fee on crude oil and the supplemental import fee on residual fuel oil in the formula is designed to put NEPCO in a position roughly similar to that of Hess up to 3,000,000 barrels of residual fuel oil per month. However, NEPCO's assumption is without foundation. *The exception relief is intended to confer a temporary benefit on NEPCO in order to preserve the continued viability of the firm during the period when the entire competitive market situation involved is under review by the FEA.* The formula is designed to correct for the built-in benefit which accrues to a hypothetical domestic refiner importing crude oil over a domestic marketer of imported residual fuel oil as a result of the Entitlements Program. *The formula is not designed to place NEPCO on a parity with Hess, for that would clearly contravene the intent of the Congress and the FEA of affording benefits to domestic refiners.*" Rec. 1816–1817 (emphasis added).

The NEPCO I initial and appeal decisions, from which NEPCO sought no judicial review, set the stage upon which the succeeding acts of the drama were played.

## NEPCO II [23]

Pursuant to leave expressed in NEPCO I, the company applied on July 10, 1975 for a continuation of the exceptions relief granted by that earlier order. The FEA received updated and audited material (for 1974) concerning NEPCO's financial condition. A public hearing was held at which representatives from NEPCO and a number of third parties appeared. In its decision issued August 7, 1975, the FEA denied NEPCO an extension of exceptions relief, on the basis that "NEPCO's operating position has improved to the point where the firm's continued activities in the residual fuel oil market are not dependent on its receiving entitlement exception relief during the month of August." [24] Reiterating the rationale of NEPCO I, the FEA stated in NEPCO II:

"It is however, important to note that the exception relief which was afforded to NEPCO on May 2 was not designed to eliminate the general operating losses which NEPCO has been experiencing for some time nor to permit NEPCO to attain a favorable competitive position. Rather, the exception relief previously approved was based on the showing that NEPCO could not continue to sustain the type of heavy operating losses in residual fuel oil sales which resulted from the competitive benefits which Hess received under FEA regulatory programs." Rec. 2661.

The FEA denied relief for August. NEPCO was granted leave to apply, on or before August 23, 1975, for relief in September.[25]

The administrative appeal decision affirmed this order, together with the initial order in NEPCO III, which will be first considered.

**22.** Rec. 1811–1812.

**23.** Case No. FEE–1801 (filed 7–10–25, decided 8–7–75), 2 FEA ¶ 83,234; order affirmed on administrative appeal, Case No. FEA–0587 (decided 11–10–75), 3 FEA ¶ 80,508.

**24.** Rec. 2662.

**25.** Rec. 2662–2663.

## NEPCO III [26]

On August 22, 1975 NEPCO applied for exceptions relief, according to the NEPCO I formula, during the month of September. The FEA denied the application, in a decision and order dated September 17, 1975, reasoning that NEPCO's operating posture was not "markedly different" from that described in NEPCO II, and that NEPCO had not demonstrated that "the firm's continued activities in the residual fuel oil market are dependent upon the approval of exception relief for the month of September." [27]

The administrative appeals decisions, both dated November 10, 1975, affirmed these orders. In the appeals decision addressing the August 7 order, the FEA took the opportunity of restating its rationale for relief underlying NEPCO I:

"NEPCO asserts that once the FEA determined in the May 2 Decision [NEPCO I] that the firm should be granted exception relief in order to mitigate the hardship which accrues to it as a result of the benefits which Hess receives under the Entitlements Program, exception relief should be extended for additional periods until such time as NEPCO is no longer incurring any operating losses. The firm therefore contends that even though its financial and operating position appears to have improved since the firm submitted the original 1975 financial projections which formed the basis for the relief approved in the May 2 Order, further exception relief was warranted for the months of August and September because NEPCO is continuing to experience operating losses.

"However, it is apparent that in its present Appeals, NEPCO is relying on an erroneous reading of the basis for the FEA's May 2 Decision to grant exception relief to the firm for a limited period of three months. In NEPCO I, the FEA determined that although the firm was not ordinarily eligible to receive any benefits under the Entitlements Program, an indefinite continuation of the market environment which existed at the time and which was in part a result of the Entitlements Program would jeopardize the continuation of the firm's residual fuel oil activities and result in NEPCO's elimination from its historic position as a strong competitor in that market. The Decision also noted that since the market situation was in a state of flux the exception relief granted to the firm would have to be reconsidered at the conclusion of the three month period ending July 31, 1975. See NEPCO I, supra at p. 83,430. Contrary to the assertion which NEPCO makes in its present Appeals, *the only reasonable inference to be drawn from the May 2 Order is that exception relief would be extended only upon a further showing by the firm that its continued viability as an ongoing business entity remained in serious jeopardy as a consequence of the FEA Regulatory Programs.*" Rec. 2704 (emphasis added).

## NEPCO IV [28]

On October 9, 1975 NEPCO applied for an extension of the NEPCO I relief for an additional period of time "commencing with entitlements to be issued and sold in October 1975 with respect to August 1975 imports of residual fuel oil." [29] The FEA, in its decision and order of November 17, 1975, extended exception relief for the month of November only. The agency keyed this decision to a showing, based upon financial statements as of September 30, that NEPCO's financial position "is considerably

---

26. Case No. FEE–1893 (filed 8–22–75, decided 9–17–75), 2 FEA ¶ 83,286; order affirmed on administrative appeal, Case No. FEA–0637 (decided 11–10–75), 3 FEA ¶ 80,508.

27. Rec. 2787–2788.

28. Case No. FEE–1963 (filed 10–9–75, decided 11–17–75), 3 FEA ¶ 83,015; order affirmed on administrative appeal, Case No. FEA–0688. (Decided 2–17–76, 3 FEA ¶ 80,581.

29. Rec. 2824. Under the operation of the Entitlements Program, the entitlements for a given month are based upon refinery runs occurring two months previously.

worse than it was when the firm filed its July 10 and August 22 exception applications", and that cash flow problems brought about "a strong possibility . . . that NEPCO will be forced to terminate its activities in the residual fuel oil market in the absence of exception relief."[30] That showing was sufficient to trigger the NEPCO I philosophy of survival, while the nation's energy policies and programs received the continuing attention of the President and the Congress. Thus the FEA concluded in NEPCO IV:

"Exception relief should therefore be granted to NEPCO which will permit the firm to continue to operate as a viable, competitive force in the residual fuel oil market while the nation's energy policies are under consideration. This result can best be accomplished by temporarily extending the exception relief which was granted to NEPCO on May 2, 1975 for the month of November. Once this nation's energy policies and programs are established on a long-term basis, a full re-evaluation of NEPCO's position will be necessary in the event that NEPCO seeks further exception relief." Rec. 2933.

NEPCO prosecuted an administrative appeal, contending that NEPCO I-formula relief should have been granted for October and December of 1975 and January of 1976, in addition to November, 1975. The appeals decision, dated February 17, 1976, rejected that contention and affirmed the relief limited to November. The agency's rationale was restated:

"It should be emphasized that NEPCO is not ordinarily eligible to receive any benefits at all under the Entitlements Program, and the exception relief which was afforded to the firm on May 2 and again on November 17 was not designed to eliminate the general operating losses which NEPCO has been experiencing nor to permit NEPCO to attain a favorable

competitive position. *See NEPCO II, supra.* Instead, the FEA's approval of exception relief in those two instances was premised on the determination that although the firm would not ordinarily receive entitlement benefits, it was necessary to accord NEPCO exceptional treatment on a temporary basis to preserve its viability during a period of uncertainty with respect to the competitive market situation and the future of the FEA regulatory programs. Relief was therefore granted to NEPCO in the May 2 Order to preserve the firm's viability while the FEA studied the entire competitive market situation with respect to residual fuel oil imported from Caribbean refineries, and in the November 17 Order while the President and the Congress reviewed the nation's energy policies and programs." Rec. 2979.

### NEPCO V [31]

On December 3, 1975 NEPCO applied for an extension of exception relief commencing with December, 1975; and (in a suggested departure from the NEPCO I formula) with entitlements to be measured by the actual number of barrels of residual fuel oil sold by NEPCO in the United States in a given month, rather than limited to 3,000,000 barrels per month.[32] Numerous third parties forwarded written comments to the FEA, or appeared at another public hearing. The agency's decision and order of February 12, 1976, reviewing NEPCO's condition in the light of the familiar NEPCO I rationale, extended exceptions relief for February and March, 1976, retaining the 3,000,000 barrel per month limitation. The FEA referred to its pending consideration of "the serious problems which exist in the East Coast residual fuel oil market."[33] As noted *supra,* that consideration culminated in April, 1976 amendments to the Entitlements Program which put an end to the

---

30. Rec. 2933.

31. Case No. FEE–2103 (filed 12–3–75, decided 2–12–76), 3 FEA ¶ 83,101; order affirmed on administrative appeal, Case No. FEA–0781 (decided 6–29–76), 3 FEA ⸫ 80,659.

32. Rec. 3048, 3302.

33. Rec. 3528.

problem. The administrative appeal affirmed the initial order.

\* \* \* \* \* \*

These, then, were NEPCO's applications to the FEA, the agency's responses, and the reasons for those responses. We turn now to the claims for relief NEPCO addresses to this Court.

### III.

### NEPCO'S CLAIMS FOR RELIEF IN THIS LITIGATION

This discussion correlates the five NEP-CO orders with the claims for relief set forth in the second amended complaint.

**NEPCO I**

NEPCO has not sought judicial review of NEPCO I.

**NEPCO II**

NEPCO contends that the FEA's decisive finding, that NEPCO's financial condition had improved to the point where it no longer depended on exception relief for continued activities, is not supported by substantial evidence in the record (First Claim for Relief).

NEPCO contends that the order [34] is arbitrary and capricious because, in accordance with regulations, 10 C.F.R. § 205.50, the FEA imposed more stringent requirements for the granting of relief (a showing of "serious hardship or gross inequity") than those contemplated by the FEA Act, 15 U.S.C. § 766(i) (a showing of "special hardship, inequity, or unfair distribution of burdens" (Second Claim for Relief).

NEPCO contends that insofar as the FEA rendered its order on the basis of third-party data not made available to NEPCO for purposes of rebuttal, and further failed to state the extent to which such data influenced NEPCO II, the order is based on findings not supported by substantial evidence (Fifth Claim for Relief).

NEPCO contends that the order is arbitrary and capricious, and not supported by substantial evidence, in that the FEA limited its consideration of NEPCO's need for relief to a period of one month (Seventh Claim for Relief).

**NEPCO III**

NEPCO makes the same contentions in respect of NEPCO III (Third, Fourth, Sixth and Eighth Claims for Relief) that it put forward in respect of NEPCO II (First, Second, Fifth and Seventh Claims respectively).

**NEPCO IV**

NEPCO contends that insofar as NEPCO IV failed to grant relief for October, 1975, it is arbitrary and capricious and based on findings not supported by substantial evidence (Ninth Claim for Relief), vices which are equally present in the failure to grant relief for December, 1975 and January, 1976 (Tenth Claim for Relief).

**NEPCO V**

NEPCO contends that insofar as NEPCO V limited the relief granted to 3,000,000 barrels per month and failed to grant relief for December, 1975 and January, 1976, it is arbitrary and capricious and based on findings not supported by substantial evidence (Eleventh Claim for Relief).

NEPCO's Twelfth Claim for Relief, not confined to any particular FEA order, alleges generally that the exceptions regulations, 10 C.F.R. § 205.50, are arbitrary, capricious and violative of the FEA Act, 15 U.S.C. § 766(i)(1)(D), in respect of the requisite showing to obtain exception relief. This is the theory specifically pleaded against the orders in NEPCO II (Second Claim for Relief) and NEPCO III (Fourth Claim for Relief).

In consequence of these contentions, the second amended complaint prays for judgment (1) declaring NEPCO II, NEPCO III,

---

**34.** While the discussion under this Point refers to each order in the singular, NEPCO of course addresses each contention not only to each initial FEA order, but to the administrative appeal order affirming it as well.

NEPCO IV and NEPCO V void to the extent that they did not grant full relief requested by NEPCO; (2) ordering the exception relief granted in NEPCO I be reinstated "in an amount at least equal to $5.3 million per month" for August, September, October and December, 1975 and January 1976; (3) remanding all challenged orders to the FEA for appropriate additional relief;[35] and (4) declaring 10 C.F.R. § 205.50 void and without legal effect.

Against this factual background, we turn to the merits of the cross motions.

## IV.

## THE CONTENTION BY EXXON THAT THE FEA LACKED AUTHORITY TO GRANT NEPCO ANY RELIEF

As detailed under Point II *supra*, the FEA granted NEPCO some exceptions relief, albeit less than NEPCO requested. In this litigation NEPCO seeks to recover that additional relief the FEA denied. The FEA, in its cross motion for summary judgment, argues that its grant of partial relief to NEPCO constituted a proper exercise of statutory and regulatory authority. Hence, the FEA concludes, NEPCO's claim for additional relief must be denied.

Exxon, intervening in the litigation by Court order, 71 F.R.D. 454 (S.D.N.Y.1976), urges in its cross motion a wholly different basis for denial of NEPCO's claim: the FEA's asserted lack of statutory authority to grant NEPCO *any* exceptions relief. As an exercise in logic, it follows that if FEA had no authority to give NEPCO anything, it cannot lawfully give NEPCO more.

The FEA and NEPCO, drawn into an unfamiliar alliance by Exxon's argument, raise the threshold question of whether Exxon as intervenor is even entitled to make the argument. That question must be resolved first.

**A.** *The Right of Exxon to Urge the FEA's Lack of Authority.*

The FEA contends that the Court cannot entertain Exxon's argument of lack of authority because Exxon's intervention status precludes the issue; alternatively, because Exxon waived the issue by failing to plead it; alternatively, because Exxon failed to preserve the issue by administrative appeal. NEPCO endorses these contentions, and adds that it would be prejudiced "if Exxon is allowed to delay this action by litigating its belated subsidiary issue."[36] The FEA and NEPCO ask that Exxon be stripped of its status as intervenor.

I find these arguments unpersuasive, individually and in the aggregate.

■ The FEA and NEPCO argue, in effect, that Exxon misled the parties and the Court in its motion to intervene by failing to state its theory expressly. Had Exxon done so, the FEA speculates, "the Court's analysis of Exxon's intervention . . . would have been different."[37] The speculation is baseless. The Court, in granting Exxon leave to intervene, was aware that "before the FEA Exxon unsuccessfully urged the denial of all relief to NEPCO", 71 F.R.D. at 459; hence the logical inference that the FEA might not adequately represent Exxon's views in the litigation, a touchstone for intervention as of right under Rule 24(a), F.R.Civ.P. Exxon's assertion before the Court of its primary contention before the FEA[38] should come as a surprise to no one; and nothing in the Court's opinion permitting intervention, or the proceedings prior to that opinion, foreclose the contention. On the contrary: further relief to NEPCO will cost Exxon money; Exxon wishes to assert a basis for denial of that relief which the FEA, as original party

---

**35.** In its motion papers NEPCO argues that remand is not necessary, and that the Court can and should proceed to give final judgment in NEPCO's favor. NEPCO main brief at 53–56.

**36.** NEPCO brief of December 8, 1977 at 7.

**37.** FEA reply brief at 42.

**38.** See, *e. g.*, Exxon's administrative appeal from the partial relief awarded NEPCO in NEPCO IV, Rec. 2985–3004, in which Exxon argued "that the FEA has no statutory authority to grant such relief." Id. at 2989.

defendant, refuses to assert and is, indeed, outraged by; the requisites of intervention under Rule 24(a) are clearly present.

There is no merit to the suggestion that Exxon waived the issue by failing to plead affirmatively the FEA's lack of authority under Rule 8(c), F.R.Civ.P. Assuming without deciding that the defense is in effect that of "illegality" or "other matter constituting an avoidance or affirmative defense", so as to require affirmative pleading under the rule, Exxon properly invokes Rule 15(a), which permits amendment of pleadings by leave of court; "and leave shall be freely given when justice so requires." I grant leave in the case at bar. No prejudice results to either NEPCO or the FEA. As noted, Exxon's contention was not new, and hence not surprising. The argument is one of statutory construction, and stands or falls upon undisputed facts; no prolongation of an evidentiary hearing results from its consideration. At oral argument on the cross motions counsel for the parties were granted leave to file whatever additional briefs they desired on the issue; the FEA and NEPCO have done so. NEPCO argues, in aid of unseating Exxon as an intervenor, that Exxon should not be "allowed to delay this action by litigating its belated subsidiary issue."[39] No prejudicial delay appears; as noted, the question of the FEA's authority to grant relief is one of law, determined by this Court as such, and ripe for appellate review if Exxon wishes to pursue it. Involvement with a third party pressing unwanted issues is a risk NEPCO accepted when it commenced litigation directly involving property rights of such a third party.

Finally, there is no merit to the FEA's argument that Exxon is foreclosed from raising the legal authority issue by the absence of an administrative appeal under 10 C.F.R. § 205.58.[40] The bar of failure to exhaust administrative remedies might be arguable if Exxon sought to undo the partial relief granted by the FEA to NEPCO; but Exxon presses no such claim for relief in its pleadings, and expressly renounced such an intent at argument[41] and in its brief.[42] The fact of the matter is that Exxon, although disapproving, was apparently content to abide by the partial relief granted NEPCO. NEPCO having lodged a judicial challenge to the partial nature of the relief, Exxon seeks to raise the FEA's asserted lack of authority, not to recover the awards with which it was content to live, but solely to block further awards. The doctrine of exhaustion of administrative remedies does not apply in these circumstances.

For these reasons the Court will consider Exxon's argument of lack of FEA authority on its merits.

B. *The Authority of the FEA to Grant NEPCO Exceptions Relief.*

Exxon's contention, in essence, is that in granting NEPCO partial relief, the FEA entirely misconceived and departed from its proper statutory function. The argument must be recognized for what it is, despite the absence of a demand for affirmative relief. The Court is asked to deny to the FEA, in legal principle if not present practical effect, the power to grant NEPCO *any* relief. I must approach that argument with caution, in view of the Temporary Emergency Court of Appeals' statement in *Marathon Oil Co. v. FEA,* 547 F.2d 1140, 1145 (Em.App.1976) that:

" . . . to deny to the agency the power in question would be inconsistent

---

**39.** Reply brief at 7.

**40.** 10 C.F.R. § 205.58 provides:

"Any person aggrieved by an order issued by the FEA under this subpart may file an appeal with the FEA Office of Exceptions and Appeals or with the appropriate Regional Office in accordance with Subpart H of this part. The appeal must be filed within 30 days of service of the order from which the appeal is taken. There has not been an exhaustion of administrative remedies until an appeal has been filed pursuant to Subpart H of this part and the appellate proceeding is completed by the issuance of an order granting or denying the appeal."

**41.** Tr. 57–58.

**42.** Exxon reply brief at 19.

with the broad discretion and flexibility we have consistently recognized in the agency's mandated attainment of the objectives of the EPAA."

*Marathon* upheld the FEA's power to regulate credit terms, in the absence of a specific grant of statutory authority. The case at bar considers a different power: that of the FEA to preserve the economic viability of a domestic marketer by granting exceptions relief within the context of the Entitlements Program. However, those concepts of "broad discretion and flexibility" recognized in *Marathon* and earlier T.E.C.A. cases, 547 F.2d at 1145 n. 14, apply here, and leave Exxon with a considerable burden of persuasion. The question, so far as the briefs of counsel and the Court's research reveal, is one of first impression.

The FEA justifies its authority by "a plain meaning interpretation"[43] of Section 7(i)(1)(D) of the FEA Act, 15 U.S.C. § 766(i)(1)(D), which at the pertinent times[44] provided:

"Any officer or agency authorized to issue the rules, regulations, or orders described in paragraph (A) shall provide for the making of such adjustments, consistent with the other purposes of this chapter, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens and shall, by rule, establish procedures which are available to any person for the purpose of seeking an interpretation, modification, rescission of, exception to, or exemption from, such rules, regulations, and orders. If such person is aggrieved or adversely affected by the denial of a request for such action under the preceding sentence, he may request a review of such denial by the officer or agency and may obtain judicial review in accordance with paragraph (2)

of this subsection when such denial becomes final. The officer or agency shall, by rule, establish appropriate procedures, including a hearing where deemed advisable by the officer or agency, for considering such requests for action under this paragraph."

The agency responded to this Congressional mandate by promulgating 10 C.F.R. Part 205, Subpart D, of which § 205.50(a)(1) provides:

"This subpart establishes the procedures for applying for an exception from a regulation, ruling or generally applicable requirement based on an assertion of serious hardship or gross inequity and for the consideration of such application by the FEA, except that applications for an exception from a regulation, ruling, or generally applicable requirement under Part 213 shall be based on the provisions of paragraph (a)(2) of this section."[45]

The FEA regards the proposition as uncomplicated and straightforward. The agency set up the Entitlements Program to implement Congressional objectives. Amerada Hess participated in that program. Hess' participation caused disastrous economic consequences to NEPCO as a domestic marketer of residual fuel oil, to the extent that the latter's existence in that capacity was threatened. The FEA regarded the demise of an independent domestic marketer as inconsistent with Congressional objectives. Section 7 of the FEA Act mandated provision for "the making of such adjustments, consistent with the other purposes of this chapter, as may be necessary to prevent special hardship, inequity, or unfair distribution of burdens . . ." NEPCO having demonstrated "serious hardship or gross inequity" under 10 C.F.R. § 205.50(a)(1), relief properly followed.[46]

---

43. Oral argument of Robert G. Heiss, Esq., Senior Attorney Adviser, Office of General Counsel, Department of Energy (successor agency to the FEA), at 82.

44. The subsection was amended by Pub.L. 94–385, Title I, §§ 103–106, August 14, 1976, 90 Stat. 1127–1129, in manners not material to the resolution of this issue.

45. Part 213 refers to oil import regulations, which are not pertinent to the case.

46. NEPCO, dissatisfied with the partial relief it received, argues that the regulatory showing of "serious hardship or gross inequity" is more onerous than, and hence inconsistent with, the statutory showing of "special hardship, inequity, or unfair distribution of burdens"; and that the FEA's equation of "serious hardship" with

In its administrative appeal from NEPCO IV Exxon argued, as it does here, that the FEA lacked statutory authority to grant NEPCO entitlement exceptions relief, the effect of which "merely exacerbates the problem" [47] presented by the Hess advantage in the East Coast market. Rejecting that argument, the FEA said on appeal:

"The assertion that the problem which NEPCO faces is part of a larger problem involving the entire East Coast residual fuel oil market is certainly correct. In fact the FEA has specifically addressed that larger problem through a rulemaking proceeding to amend the Entitlement Program regulations. See 41 Fed.Reg. 7125 (February 12, 1976). However the FEA cannot avoid making a decision on individual applications for exception relief in which a clear case is made that FEA regulatory requirements are resulting in a serious hardship to the firm applying for relief, solely because the problem presented has larger policy implications. Under Section 7(i)(1)(D) of the Federal Energy Administration Act as implemented by the provisions of 10 CFR, Part 205, Subpart D, of the FEA procedural regulations, the FEA is directed to grant exceptions from generally applicable regulatory requirements in cases where an applicant demonstrates that relief is necessary to alleviate or prevent serious hardship, gross inequity or unfair distribution of burdens. The approval of exception relief in the November 17 Order was based on the determination that NEPCO had made a convincing showing that it had already and would continue to experience a serious financial hardship as a result of FEA regulatory requirements. Neither Exxon or Mobil has provided any material which contradicts the basis for that determination or in any way indicates that it was erroneous." Rec. 3012.

The FEA, in short, perceives a causal connection between its program and economic

"terminal hardship", in respect of NEPCO, was erroneous. These contentions are considered *infra*. They are not germane to Exxon's argument.

hardship to NEPCO, and concludes that the program's exceptions machinery may appropriately be used to address the hardship. Counsel to the department of Energy summed it up at the argument:

MR. HEISS: ". . . Well, the entitlements program in part at least created a burden on NEPCO.

What could be a more appropriate mechanism or machinery by which the harm can be cured?" Tr. 82–83.

Exxon contends that the exceptions mechanism is entirely inappropriate for NEPCO. Exxon's basic argument is that the FEA in effect granted NEPCO "subsidy relief" which neither the EPA Act nor the FEA Act sanction. In Exxon's view of the statutory and regulatory scheme, exception relief "may be granted only to relieve a firm of the *direct* burden of FEA regulation"; within the Entitlements Program context, exception relief is authorized "only to relieve the burden of an obligation to purchase entitlements . . ." [48] Since NEPCO, not a domestic refiner, was under no such obligation, it follows that it is not eligible for exceptions relief.

■ The Court concludes that Exxon's perceptions of the statutory objectives, and the obligations of the FEA derived therefrom, are unacceptably narrow. I decline to hold that the FEA lacked the authority to redress this particular economic hardship brought about by its programs. I hold instead that application of Entitlements Program exceptions relief to NEPCO was consistent with both the intent and the structure of the governing statutes.

Initially, I do not share Exxon's perception of the NEPCO relief as "subsidy relief". That concept, which permeates Exxon's brief, is pejorative in nature: NEPCO's marketing competitors, the argument runs, are unjustly compelled to make transfers from their own treasuries to that of a commercial rival. Cast in those bald terms, the

47. Appeal decision, Rec. 3011.

48. Exxon main brief at 30–31.

concept seems wrong, even un-American: one should sink or swim unaided in a competitive, free enterprise system.

The provisions for exceptions relief, however, cannot be separated from the conditions and statutes giving rise to them. The concept must be considered in the light of the reasons for its creation. The EPA Act and FEA Act constitute unusual peacetime legislative controls over industry. The Allocation Act, we are reminded, "was enacted by Congress to authorize the President to deal with the present or threatened severe economic hardships caused by shortages of imported and domestically produced crude oil, all of which constituted a 'national energy crisis' and a threat to the public health, safety, and welfare." *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1394 (Em.App.1975). Implementation of the Congressional purposes under emergency conditions was quickly perceived as "exceedingly complicated undertakings", *Condor Operating Company v. Sawhill,* 514 F.2d 351, 359 (Em. App.1975), *cert. den.,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467; the FEA's broad mandate left it with a "gargantuan task", *Pasco, supra,* at 1394, which had to be swiftly accomplished. It is quite clear that all economic consequences of this rapidly constructed, complicated, innovative machinery could not be foreseen at the time of its fashioning. Precisely for that reason, Congress mandated broad and flexible exceptions relief. The case at bar demonstrates the wisdom of the mandate. Nobody foresaw the particular impact of the Entitlements Program upon the East Coast residual fuel oil market. That impact arose out of the unique status of Amerada Hess as a Caribbean-supplied but nonetheless "domestic" refiner. If we are to speak in terms of a "subsidy", we should begin there: the participation of Hess in the program bestowed upon that company unanticipated economic advantages over its market competitors, unwelcome to all of them, potentially ruinous to NEPCO. The adverse effect upon NEPCO stemmed from the combination of Hess's ability to participate in the program and NEPCO's inability to do so, under the existing statutory and regulatory scheme. NEPCO's situation could be relieved by limited participation in the Entitlements Program. It would, of course, be necessary to *adjust, modify* or grant an *exception to* the rules and regulations to permit such relief. The FEA determined that relieving NEPCO would further the purposes of the statutes. § 7(i)(1)(D) of the FEA Act requires the agency issuing "the rules, regulations or orders" which implement the statute to provide for the making of such *"adjustments"* as may be necessary "to prevent special hardship, inequity or unfair distribution of burdens"; the agency is further required to establish procedures for seeking "modification" or "exception to" such rules, regulations and orders. The Court agrees with the FEA that the relief it granted to NEPCO was sanctioned by the plain meaning of the statute.

Exxon would limit "exception relief" under the entitlements program to companies bearing the burden of obligations to purchase entitlements. Relying as do all three parties in their briefs on dictionary definitions, Exxon equates an "exception" to an "exclusion" or being "taken out" of a program otherwise applicable; since NEPCO was not in the program, it cannot be excepted from it. The argument has surface appeal, if one focuses a narrow vision upon the word "exception"; an astigmatism which the FEA itself encourages by referring in its regulations only to "an exception from a regulation, ruling or generally applicable requirement . . ." However, § 7(i)(1)(D) of the FEA Act uses a variety of broad words, such as "adjustments", "modification", "recision" and "exemption", in addition to "exception".

Furthermore, the T.E.C.A. in *Delta Refining Co., supra,* said of § 7(i)(1)(D) that: ". . . a careful reading of that section indicates clearly that it is a *double-barreled mandate* from the Congress to the administering agency to carry out *two separate and distinct functions* :

(1) 'provide for the making of such adjustments . . . to prevent special hardship or unfair distribution of burdens' and (2) 'shall, by rule, estab-

lish procedures which are available to any person for the purpose of seeking an interpretation, modification, recision of, exception to, or exemption from, such rules, regulations, and orders.'" 559 F.2d at 1196 (emphasis added).

In this Court's view, the partial relief granted by the FEA to NEPCO may properly be regarded as an "adjustment" necessitated by "special hardship or unfair distribution of burdens." That the entitlements program impacted adversely upon NEPCO as a domestic marketer cannot be gainsaid.[49] No reasonable basis is suggested for limiting the FEA's statutory ability to adjust hardships to one class of regulatory victims (domestic refiners), leaving another (domestic marketers) without remedy.

On the contrary, the cases cited by Exxon speak in broader terms than Exxon's argument would suggest. *Pasco, supra,* describes the purpose of the entitlements program as insuring that "all refiners *and marketers* shared equally in the benefits of price-controlled crude oil and the burdens of uncontrolled crude oil . . ." 525 F.2d at 1395 (emphasis added). *Cities Service Co., supra,* defines the program at 529 F.2d 1021:

"The basic purpose of the Entitlements Program was to spread the benefit of access to old price-controlled oil and the burden of dependence on uncontrolled oil *among all sectors of the petroleum industry, all regions of the country, and among all consumers of petroleum products,* while retaining the incentives for increased production and anti-inflationary measures which the two-tier price system provided." (emphasis added).

The FEA granted partial relief to NEPCO out of concern for the latter's viability as a domestic marketer. Congressional concern for independent domestic marketers, among other sectors of the industry, is expressed throughout the statutory scheme.[50]

In sum, I am not persuaded that the FEA, extending partial relief to NEPCO, so misconceived its responsibilities that it violated the statutes. I reach precisely the contrary conclusion on the basis of the plain statutory language; and any lingering misgivings are surely assuaged by the "special attention" to the rule of deference courts must pay to this implementing agency's interpretation of a new and complex statute. *Powerine Oil Co. v. FEA,* 536 F.2d 378, 385–386 (Em.App.1976); *Delta Refining Co., supra,* at 1194.[51]

**49.** Exxon seeks to dismiss that impact as "indirect harm [NEPCO] may have suffered from benefits provided by other firms." Brief at 30. The immediate effect upon NEPCO of Hess's participation in the entitlements program seems direct enough; in any event, the FEA Act mandates redress of "special hardship or unfair distribution of burdens", without reference to "direct" or "indirect" forces. It is the causal connection between the program and the hardship, clearly present here, that controls.

**50.** EPA Act, § 4(b)(1)(D), 15 U.S.C. § 753(b)(1)(D); FEA Act, § 18(a)(2), (8), 15 U.S.C. § 777(a)(2), (8).

**51.** Judicial reversals of FEA rulings are extremely rare. One example is presented in *Delta Refining Co., supra,* in which the district court set aside FEA action in upwardly adjusting a refiner's pretax income for 1975 to offset a change in inventory valuation from FIFO to LIFO, all within the context of determining final exceptions relief for the year. It appeared that in a prior case involving another company and presenting almost the identical issue, the FEA refused to make such an adjustment, citing its own general rule on the subject. The T.E.C.A. affirmed the district court, regarding it "of paramount importance that the agency adhere to its own announced rules, that they be applied uniformly, and that the agency be evenhanded in its treatment of refiners in the Entitlements Program." 559 F.2d at 1199.

In the case at bar, Exxon points to the FEA's denial of exceptions relief in *Wallace & Wallace Chemical & Oil Co.,* 2 FEA ¶ 83,207 (1975) as inconsistent with a grant of relief to NEPCO. The two cases bear no meaningful relationship. Wallace & Wallace, a retail distributor of fuel oil, contemplated construction of a refinery; it requested special entitlements participation in order to obtain financing before the refinery was even built. The FEA concluded, not surprisingly, that the entitlements program could not be used to confer *benefits* upon a *non-existent* refiner. The case at bar concerns the redress of *hardships* visited by the program upon an *existing* marketer. I agree with the argument of Mr. Heiss of the Department of Energy:

"Wallace & Wallace is a distinguishable situation. There was a new entrant. It had not been in the program, had not been burdened

I have considered Exxon's other arguments and find them to be without merit.[52] The Court rejects the contention that the FEA lacked authority to grant NEPCO any relief.

## V.

## NEPCO'S CLAIMS FOR ADDITIONAL RELIEF

NEPCO's broad attack upon the relief granted by FEA contends that the agency's regulatory standards for exceptions relief are inconsistent with and violative of the statute; that the standards actually applied by FEA to NEPCO also violated the statute; that the FEA deprived NEPCO of administrative due process; and that the partial relief awarded was inadequate, arbitrary and capricious, and not supported by substantial evidence. We consider those arguments in order.

### A. The Validity of the Regulatory Standards for Granting Relief.

The FEA Act, as noted, requires that the FEA provide for the making of such adjustments:

". . . as may be necessary to prevent special hardship, inequity or unfair distribution of burdens." 15 U.S.C. § 766(i)(1)(D).

Responding to that direction, the FEA set up exceptions procedures based on:

". . . an assertion of serious hardship or gross inequity . . ." 10 C.F.R. § 205.50.

NEPCO perceives a disparity in these standards, with the FEA's language imposing an impermissibly onerous burden upon the applicant for relief. There is said to be a shift in focus from the statute's relative concept of hardship to the regulation's absolute concept; NEPCO finds support for its analysis in the *Random House Dictionary of the English Language* (1973).

Government counsel rely upon their dictionary, *Webster's Third New International* (1968), for the proposition that the agency's standard is less onerous than that of the statute, not more.

Just as beauty lies in the eye of the beholder, so the meaning of words may lie in the mouth of the advocate. Language has infinite subtleties and nuances. The present advocates' battle of dictionaries led the Court to *Roget's Thesaurus*; in his introduction to the pocket edition (1946) I. A. Richards writes:

"Words are astonishingly like people. They have characters, they almost have personalities—are honest, useful, obliging . . . or treacherous, vain, stubborn . . . *They shift, as people do, their conduct with their company.*" (emphasis added).

In the case at bar, NEPCO contends that the FEA's words ("serious hardship or gross inequity") depart from and distort the words used by Congress ("special hardship, inequity or unfair distribution of burdens") to such a degree that the agency action cannot stand.

No court has previously considered such a contention. While the FEA says the T.E.C.A. has referred to the "serious hardship or gross inequity" standard "with approval on several occasions,"[53] citing *Pasco, supra, Powerine Oil Co., supra,* and *Crown Central Petroleum v. FEA,* 542 F.2d 69 (Em.App.

---

by the program. Why use the entitlements program as a subsidy mechanism? That's a wholly distinguishable situation we believe. "Basically the entitlements program here contributed to harm, unlike Wallace's situation, and we feel thus the program can be a viable method of giving exception relief from the program." Tr. 83–84.

**52.** For example, Exxon argues that NEPCO did not suffer a "special" hardship because other competitors of Hess in the East Coast market were disadvantaged by Hess's participation in the entitlements program. Accepting that to be true, NEPCO was nonetheless entitled to present its own situation to the FEA and ask for relief, as the FEA recognized, see appeal decision, NEPCO IV, at pp. 1296–1297, *supra*; and it is fairly apparent that the other competing companies were so situated economically that they could not have made that showing of terminal hardship the FEA found in respect of NEPCO.

**53.** Reply brief, p. 7n.

1976), none of these cases involved the present challenge to the standard, and so they cannot be said to reject NEPCO's argument or support that of the FEA. There is no legislative history focusing particularly upon these words.

It is apparent, however, that the FEA was endowed with broad discretion in fashioning exception relief. Congress mandated such relief in principle, but left its practical implementation to the executive arm. Thus the T.E.C.A. said in *Powerine Oil, supra,* at 384:

"The determination of criteria for making adjustments or granting exception relief was left by Congress to the President, and by him to the agency administering the Act. Congress specified no tests or standards to be followed in such cases; rather, the agency was to provide an avenue for application for relief and, upon a denial of relief, the availability of administrative appellate review."

■ NEPCO must argue that, despite the *tabula rasa* discretion Congress granted the FEA in respect of "the determination of criteria for making adjustments or granting exception relief", the agency so misconstrued the statute as to promulgate an invalid regulation in § 205.50. NEPCO bears a heavy burden of persuasion, in view of the settled rule that the agency's regulation must be upheld "if it had any rational basis to support it." *Basin, Inc. v. FEA,* 552 F.2d 931, 934 (Em.App.1977). Construing the statutory mandate for exceptions relief, the FEA fashioned the regulation in question. The agency's construction of the statute it is charged to administer "is entitled to deference by the courts", *Basin* at 934; judicial review of the appropriateness of regulations is limited. In *Condor Operating Co., supra,* the Court said at 359:

"Where the obvious intent of Congress is to give the President and his delegates broad power to do what reasonably is necessary to accomplish legitimate purposes rendered necessary by a recognized emergency, and regulations are fashioned to implement the Congressional mandate,

the court should not interfere with the prerogative of the agency to select the remedy which for rational reasons is deemed most appropriate."

■ The FEA, in drafting § 205.50, could one supposes have parroted the language of Section 7(i)(1)(D) of the FEA Act; had it done so the present question would not arise. The agency, for reasons that are not apparent, chose not to do so; the statutory mandate to prevent "special hardship, inequity or unfair distribution of burdens" is implemented by a regulation redressing "serious hardship or gross inequity". I may invalidate that regulation only if I conclude that the *concepts* embraced by the different *words* are in themselves so different as to brand the regulation irrational. I do not reach that conclusion. I simply do not perceive the quantum difference NEPCO sees between a "special" hardship and a "serious" hardship; nor, in my judgment, does the agency's prefacing of "inequity" by the adjective "gross" bring the regulation into irreconcilable conflict with the statute. The key concepts are *hardship* and *inequity*; Congress expressed concern about them in the statute; the FEA made them the triggers for exceptions relief in the regulation. I decline to invalidate the regulation because the FEA, out of the wealth of the English language, chose different adjectives.

Perceiving no significant difference between the statute and the regulation, and thus no basis for invalidating the latter, I need not pass upon the FEA's alternative contentions that 15 U.S.C. § 766(i)(2)(A) provided the only legitimate procedure for NEPCO to challenge the regulation, or that NEPCO had failed to exhaust its administrative remedies.[54]

B. *The Validity of the Standards for Granting Relief Applied by the FEA to NEPCO.*

NEPCO next contends that, "even if FEA's serious hardship and gross inequity standard is deemed to be consonant with

---

**54.** Main brief, pp. 18–22.

the statutory mandate, the test actually applied to NEPCO is clearly not." [55] Specifically, NEPCO complains that it was required to make a showing of "financial disaster" [56] in order to meet a "virtual bankruptcy", [57] "tombstone" or "deathbed" test [58] before obtaining any relief; and that such onerous standards cannot be reconciled with the FEA Act's mandate to prevent "special hardship, inequity, or unfair distribution of burdens." [59]

We must recognize at the outset that NEPCO's choice of words is justified. The FEA granted relief in NEPCO I because it concluded that without it, "the firm's ability to remain a viable independent competitor will be substantially endangered . ." (p. 1288, supra). That theme runs through all the NEPCO decisions. The FEA granted relief where it appeared necessary to forestall NEPCO's commercial demise; relief was withheld when the company's condition was perceived to have improved, although its operations were not yet profitable.

As noted supra, [60] NEPCO's administrative appeal from NEPCO I did not challenge the "tombstone" test as applied to it; nor was judicial review sought of that initial decision. Thus the "tombstone" test is attacked, as violative of the statute, for the first time in this litigation. From those facts the FEA argues that, under the principle of res judicata, "three guiding principles" have been "conclusively established for the purposes of this action":

"1) Exceptions relief to NEPCO was to be a temporary measure designed to preserve the corporation's viability as a marketer in the eastern United States residu-

al fuel oil market until the FEA could resolve the problems which there existed;

"2) NEPCO was not entitled to have its Bahamian refinery classified as a domestic refinery for the purposes of the Buy/Sell and Entitlements Programs; and

"3) No obligation was undertaken or assumed by the FEA to put NEPCO in competitive parity with Hess." Reply brief at 18.

A broad acceptance of the first of these propositions would foreclose, on res judicata grounds, consideration of NEPCO's basic challenge to the statutory validity of the hardship standard applied by FEA. I conclude, however, that res judicata does not foreclose that particular question. While *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966), cited by the FEA on the res judicata point, holds that res judicata applies "when an administrative agency is acting in a judicial capacity and resolves *disputed issues of fact* properly before it" (emphasis added), Professor Davis (upon whose treatise the Court generally relied in *Utah Construction*, 422 n. 20, 86 S.Ct. 1545) observes that "the doctrine is weaker as applied to questions of law than as applied to questions of fact". [61] Whether the hardship standard applied by the FEA to NEPCO violated the statute is a question of law; and if that question be answered in the affirmative, it could surely be said that the agency's determinations were not supported by "substantial evidence", thereby bringing the case within the T.E.C.A.'s recent pronouncement in *Atlantic Richfield Co. v. FEA*, 556 F.2d 542, 549–550 (Em.App.

---

55. NEPCO main brief, p. 14.

56. *Ibid.*

57. Reply brief, p. 23.

58. Oral argument, Tr. 9.

59. Reply brief, at 12–13.

60. Pp. 14–15.

61. 2 Davis, Administrative Law Treatise § 18.-03 at p. 558 (1958). That author continues:

"The desire for repose on which res judicata rests relates primarily to findings of fact; repose on lively problems of law may even be affirmatively objectionable. A tribunal ought not to be barred from using trial-and-error methods of feeling its way into an undeveloped frontier of law and policy. Even when the principle of res judicata should be rigidly applied to findings of fact, some relaxation of its application to rulings of law may be indicated." *Id.* at 566.

1977), on *res judicata* and collateral estoppel:

" . . . the prevailing rule is that administrative determinations may be given collateral estoppel effect between the parties and their privies if they are the result of fair adversary hearings *and are supported by substantial evidence* but that where these elements are lacking no such effect should be accorded them." (emphasis added).

■ In these circumstances, NEPCO is not barred from asserting in this litigation that the hardship standard applied to it by FEA in granting or withholding relief violated the statute. I turn, therefore, to that question.[62]

Stated more precisely, the question is whether FEA's "tombstone" test departs from the statutory standard as implemented in the regulation, § 205.50, since I have concluded that the latter is consonant with the former.

*Prima facie*, there is an appeal to NEPCO's argument. To obtain any relief, NEPCO was required to demonstrate that it was on the brink of disaster as a marketer. Terminal hardship certainly sounds different from "special hardship" (the statute) or "serious hardship" (the regulation); and it is a ground for reversal of FEA action if the agency fails to "adhere to its own announced rules", *Delta Refining Co.,* at n. 51 *supra.*

The complexities of the question do not yield readily, however, to semantics. The statutory and regulatory scheme is complicated, its impact upon the industry far from certain at the time of drafting, and the agency's discretion in redressing inequities broad. The FEA, focusing upon the NEPCO situation, was interpreting its own reg-

ulation for exception relief; and the agency's interpretation of its own regulation must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). We have also noted, and need not reiterate here, the degree of deference which the T.E.C.A. accords the FEA's interpretations and implementations of the governing statutes. The FEA, in dealing with NEPCO, equated "special" or "serious" hardship, and "gross inequity", with *terminal* hardship. We must inquire whether that interpretation is *plainly* erroneous or inconsistent with the statute or regulation. If the interpretation cannot be so stigmatized, then the Court cannot disturb it.

The FEA's rationale appears clearly enough from its discussion in NEPCO I. The agency gave controlling weight to NEPCO's status as a *foreign refiner.* Because that was so, the FEA concluded that the relief NEPCO sought was neither "necessary or appropriate." The agency continued, in NEPCO I: "The specific relief requested by NEPCO, if granted, would permit it to receive virtually the same benefits that domestic refiners enjoy as a result of certain FEA programs." Rec. 1738. The FEA declined to accord NEPCO such treatment.

In this litigation NEPCO does not dispute the FEA's refusal to treat it as a domestic refiner;[63] nor could it do so, in view of the geographic boundaries laid down by the statute.[64] But the weakness in NEPCO's argument lies in its inability or unwillingness to perceive the implications of its status as a foreign refiner. Precisely because NEPCO was a foreign refiner, albeit a do-

---

**62.** If I am in error on this consideration, and *res judicata* forecloses NEPCO's argument, then of course the following discussion under this heading signifies nothing, and we pass directly to a consideration of whether the FEA properly applied the "tombstone" hardship standard to the facts as revealed by the administrative record. See Point V–D, *infra.*

**63.** Oral argument, Tr. 13.

**64.** See n. 3, *supra.* NEPCO devotes considerable effort in its motion papers to a demonstration that its Bahamas refinery is closer to the United States than the Hess refinery in the Virgin Islands, and that the Bahamas refinery is important to the nation. If the argument is that the designation of the Bahamas refinery as foreign is unfair, it is addressed to the wrong forum.

mestic marketer, the FEA imposed a higher standard of hardship, and a lesser degree of relief, than would have been accorded to a domestic refiner, which could apply for exceptions relief from the entitlements program in order to preserve an historic profit margin or its return on invested capital.[65]

In other words, the FEA requires a domestic refiner, participating directly in the entitlements program, to demonstrate a lesser degree of hardship to obtain exceptions relief than a foreign refiner who is also a domestic marketer, adversely affected in that latter capacity by the program. That is a distinction which the FEA was entitled in law to draw; NEPCO points to no authority for foreclosing it. The FEA's main brief (p. 49) accurately summarizes the "serious hardship" test applied to NEPCO as one "which would jeopardize the firm's continued activities in the residual fuel market." NEPCO would undoubtedly have preferred a less stringent standard, closer to that required of domestic refiners, but I find no basis for concluding that the statute or regulation required such a measure. The FEA, presumptively impartial and endowed with industry expertise, applied what it considered to be the appropriate standard for relief to a company which opposing interests argued forcibly was not entitled to any relief at all. That standard violates neither statute nor rule, and the Court will not disturb it.

It should be reiterated that the FEA was responding to a problem that had arisen within a particular area, the East Coast residual fuel oil market. The agency devised short term relief for NEPCO, a marketer particularly adversely affected, while working out the long term resolution of revised regulations which put an end to the problem. The situation is analogous to the market disparities that arose in Puerto Rico, which the FEA addressed by regulations and determinations affirmed in *Texaco, Inc. v. FEA*, 531 F.2d 1071 (Em.App. 1976), *cert. den.*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed. 394. The T.E.C.A. summarized the scope of judicial inquiry:

"Our province is simply to determine whether the issuance of such regulations was in excess of the agency's authority, was arbitrary or capricious or was otherwise unlawful under the criteria set forth in 5 U.S.C. § 706(2) and section 211(d)(1) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note (Supp.1975). The arbitrary or capricious standard requires a determination whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions approved by the administrative body. *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council*, 481 F.2d 1388, 1391 (Em. App.1973). The burden is on the objectors to demonstrate the invalidity of the regulations. *Pasco, Inc. v. Federal Energy Administration*, 525 F.2d 1391 (Em. App.1975); *Condor Operating Co. v. Sawhill*, 514 F.2d 351, 359 (Em.App.1975), cert. denied, 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975); *American Nursing Home Ass'n v. Cost of Living Council*, 497 F.2d 909, 914 (Em.App.1974)." 531 F.2d at 1076–1077.

In the case at bar, both Exxon and NEPCO attack the validity of the FEA's regulations and interpretations; neither of them carries the burden summarized in *Texaco, Inc.* The FEA acted to preserve the viability of NEPCO as a marketer while the long-range solution was being sought, an action clearly within the authority granted by Congress to "preserve the competitive viability of . . . independent marketers," 15 U.S.C. § 753(b)(1)(D). At the same time, the FEA declined to permit NEPCO exception relief participation equivalent to that of a domestic refiner, an action equally clearly sanctioned by Congress's objective of equitable distribution at equitable prices "among all areas of the United States," 15 U.S.C. § 753(b)(1)(F). The agency took into

---

**65.** *Powerine Oil Co., supra*, at 382.

account its statutory responsibilities, and the standard of hardship by which NEPCO's applications were measured constituted a rational response to the short-term market-wide problem, ultimately resolved by amendments to the entitlements program. I conclude, as did the district court in *Texaco, Inc., supra,* that the FEA's standard "represent[s] a rational exercise of the powers delegated to it and that there was no clear error of judgment." 531 F.2d at 1077.

## C. *NEPCO's Procedural Attack Upon the Validity of NEPCO II and NEPCO III.*

Before coming to the merits of the four challenged decisions and related appeals, we consider a procedural challenge NEPCO makes to NEPCO II and III.

The question arises in the following manner. NEPCO I granted the company limited relief for the months of May, June and July, 1975, with leave to apply for an exten-sion of relief beyond July. NEPCO applied for an extension. On July 29 the FEA held a public hearing on NEPCO's extension request. Representatives of a number of companies and associations, including NEPCO's marketing competitors, appeared and testified in opposition. During the course of the hearing, several of these opponents suggested that NEPCO had made use of the funds generated by the exceptions relief in May to lower its prices, compete in the market, and woo away customers from its competitors. NEPCO spokesmen denied those suggestions. Melvin Goldstein, the director of the FEA's Office of Exceptions and Appeals, who conducted the hearing, requested NEPCO's competitors and NEPCO itself to submit further marketing data addressing this issue, not later than August 5. Those requests were reiterated in a series of mailograms Goldstein sent out on July 30.[66]

---

**66.** NEPCO was requested to furnish the following:

"(1) An affidavit executed by an officer of NEPCO setting forth NEPCO's recent business activities with respect to residual fuel oil in the Syracuse and Albany, New York areas and in the New York-New Jersey metropolitan area. That document should contain a description of NEPCO's solicitation of new residual fuel oil customers and new accounts which the firm has obtained since May 1, 1975 in those area.

"(2) A detained discussion of NEPCO's business relationship with Orange & Rockland utilities during the past two years.

"(3) With respect to Burns Brothers, Inc. and any other entities of the Carey Energy Corporation which engage in the sale of residual fuel oil (other than NEPCO), schedules itemizing the following data regarding their sales of residual fuel oil during the months May, June and July 1975:

(a) The names of any new customers acquired by the entities described above including customers who have increased their purchases of product from a Carey entity;

(b) The market area in which each customer described in (a) above is located and the names of the principal competitors in those market areas;

(c) A description of the Carey Energy entity's prior relationship with each customer described in (a) above; and

(d) The amount and type of residual fuel oil which each customer described above purchased from the Carey Energy entity and the weighted average price charged by the entity to each such customer in May, June and July.

"(4) The names of those customers to whom a Carey Energy entity, as described above, has charged a price for residual fuel oil during the period May through July 1975 which is lower than the price which it charged to the customer in April 1975. For each such customer, please provide a list showing the price charged in April and the prices charged in each month from May through July 1975." R. 2495–2497.

A typical request to a NEPCO competitor, Cirillo Brothers Oil Co., requested:

"(1) Data regarding the residual fuel oil accounts and sales which Cirillo Brothers has lost to NEPCO since May 1, 1975. That data should include (i) the names of the customers involved; (ii) the volume of sales lost; (iii) a description of the market area in which each of the customers is located; and (iv) the historical business relationship between Cirillo Brothers and each customer.

"(2) A list of the instances in which Cirillo Brothers has reduced its selling prices for residual fuel oil since May 1, 1975 as a result of a price reduction implemented by NEPCO. That list should include (i) the names and locations of the customers to which Cirillo Brothers reduced its prices; (ii) the dates on which the price reductions were effectuated; (iii) the prices charged to each customer involved for each grade of residual fuel oil prior to and following the price reduction; and (iv) an indication of the dates on which and the extent to which NEPCO reduced its prices." R. 2499–2500.

NEPCO submitted such additional data; so did companies that had opposed further relief for NEPCO at the July 29 hearing.[67] The data was designated "confidential" by the companies submitting it, and consequently was not, under the regulations, immediately available for inspection by other parties. 10 C.F.R. § 205.9(f).

In its decision denying NEPCO's application for extension of exceptions relief beyond July, the FEA said in part:

"In connection with NEPCO's application for an extension of exception relief the Federal Energy Administration held a public hearing on July 29, 1975 in order to afford interested parties an opportunity to present their views. At the hearing, several independent marketers which operate in the same markets as NEPCO asserted that they have been adversely affected by the award of exception relief to NEPCO and that as a result of the relief which NEPCO received the firm has been able to aggressively compete for new business and gain a competitive advantage over those marketers. NEPCO strongly denied those assertions, and the firms which made those allegations as well as NEPCO were requested to submit certain supporting documentary material. *The material which has been received has been taken into consideration in the decision which is being reached today.*" R. 2661 (emphasis added).

NEPCO contends that since it never saw the post-hearing material submitted by its opponents, and thus could not rebut it, the proceedings were fatally defective[68] and NEPCO II must be invalidated, as must NEPCO III, which is contaminated by the same vice.

I find these contentions to be entirely without merit.

■ The fact that a party to an exceptions proceeding has not viewed or commented upon confidential material submitted by another party is without procedural significance unless grounds exist for inferring that its comments would have changed the result. In *Amtel, Inc. v. FEA,* 536 F.2d 1378 (Em.App.1976), Amtel opposed exception relief requested by Whitco, Inc., a wholesale purchaser-reseller under 10 C.F.R. § 211.51. The FEA, before rendering a decision in Whitco's favor, considered updated financial information submitted by Whitco in confidence under 10 C.F.R. § 205.9(f) which Amtel did not see. The T.E.C.A. rejected Amtel's claim of denial of procedural due process:

"There is no indication that any comment by Amtel concerning the updated information would have made any difference in the result or, indeed, that there would have been any different response from Amtel than it had made to Whitco's original submission." 536 F.2d at 1382.

■ NEPCO's due process claim is equally deficient, and on both grounds stressed in *Amtel.* There is no indication that the post-hearing material submitted by NEPCO and its rivals played a part of any moment in the agency's decision-making process. On the contrary, the detailed and carefully expressed opinion (R. 2657–2664) makes it clear that the FEA rejected the extension because it was satisfied by entirely different documentation (audited financial statements, data on decreases in the cost of crude oil, and projected profit and loss statements) that "NEPCO's current financial position is better than the projections in the original NEPCO Application for Exception." R. 2659. The heart of the agency's rationale appears in this sentence:

67. Asiatic Petroleum Corp.; Metropolitan Petroleum Co.; Cirillo Brothers Oil Co.; and Howard Oil Co., Inc. Amerada Hess also submitted post-hearing material, addressing different questions.

68. NEPCO makes two procedural arguments. First, since the agency's factual determinations must be supported by "substantial evidence", procedures must exist to provide "some mech-

anism for interested parties to introduce adverse evidence and criticize evidence introduced by others." *Mobil Oil Corp. v. FPC,* 157 U.S.App.D.C. 235, 255, 483 F.2d 1238, 1258 (1973). Second, NEPCO argues that its non-inspection of this material rises to the level of deprivation of administrative due process, under cases such as *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

"The data which NEPCO has submitted in connection with its present request for an extension of exception relief indicates that these objectives have been effectuated, partly as a result of the exception relief already provided, and that further relief is not warranted for the month of August." R. 2661.

It is clear from a reading of the decision that the "data" referred to is the broad financial data submitted by NEPCO at the hearing, rather than the material submitted by its competitors after the hearing on the particular point of market competition they had raised. While it is true that the FEA in its decision acknowledged receipt of that material and said it had "been taken into consideration",'it is fair to say that: "Altogether too much is made of this reference." *Atlantic Richfield Co. v. FEA,* 556 F.2d 542, 547 (Em.App.1977) (rejecting claim of denial of due process on basis of passing reference in FEA decision to "an investigation" by the agency to which party was not privy). It is apparent that the sentence upon which NEPCO focuses is no more than a polite bureaucratic acknowledgment of material which the agency requested, but to which no particular significance was ultimately attached. In its brief, NEPCO says that it "does not believe that any material of this nature was relevant to the special hardship or inequity being suffered by NEPCO";[69] I am persuaded by the *ratio decidendi* of NEPCO II that the FEA reached the same conclusion. That is sufficient to dispose of the due process claim.

Furthermore, there is no basis for inferring that NEPCO's response to this additional material would have been significantly different than the arguments it put forward at the July 29 hearing. Goldstein raised the question of post-May, 1975 market increases by NEPCO early in the hearing.[70] NEPCO spokesmen denied such activities, and testified on the subject at some length, either addressing the general subject[71] or in rebuttal to particular suggestions made by adverse parties.[72] The FEA was well aware of NEPCO's position on the question of possible post-May, relief-fueled market aggression on its part. I have examined the post-hearing confidential material submitted by the parties adverse to NEPCO. To the extent that it is argumentative or conclusory, NEPCO's position was already on record. To the extent that precise marketing data was furnished, it is true that NEPCO did not see it, but there is no indication that it made any difference to the result.

Finally, there was a failure on NEPCO's part to exhaust administrative remedies which moots the question here. *Amtel, supra,* held at 1382:

"And could there be thought in this administrative context any due process problem otherwise, Amtel's failure to exhaust its related administrative remedies, 10 CFR § 205.9(f)(1) and 10 CFR Part 202, and to press the matter before the district court at the November 24, 1975 hearing, renders the point moot here."

That principle is applicable here, although it impacts at the district rather than circuit court level. Copies of the post-hearing materials were available for NEPCO to inspect in the FEA public docket room, 10 C.F.R. § 205.173(f), except to the extent that confidential data had been excised pursuant to § 205.9(f). NEPCO never examined the copies in the public docket room.[73] It justifies the omission on the basis that the significant data was confidential and thus excised; but if examination of the "public" copies had persuaded NEPCO that their adversaries' arguments were worrisome and the data in urgent need of rebuttal, NEPCO could have proceeded under 10 C.F.R. Part 202 to request production, § 202.3, and at the very least require an independent

---

**69.** Main brief, p. 57.

**70.** R. 2298.

**71.** R. 2300–2301.

**72.** In response to Cirillo: R. 2446; in response to Howard: R. 2456–2458; in response to Metropolitan: R. 2468–2469.

**73.** Affidavit of Marcia B. Proctor, Ex. A to FEA's motion.

determination by the FEA that the deleted portions were in fact protected. § 202.-22(b); § 205.9(f)(2). Having failed to avail itself of these administrative procedures, NEPCO cannot now complain of their inadequacy, and the principle declared in *Mobil Oil Corp. v. FPC, supra,* is not applicable. The likely explanation is that NEPCO's inactivity in respect of this material was tactical; as such it cannot support a due process claim. Cf. *Atlantic Richfield Co., supra,* at 548.

The challenges to NEPCO II and NEPCO III on procedural grounds are rejected.

D. *The Merits of NEPCO's Challenges to the FEA Orders*

We come at last to the merits of NEP-CO's challenges to NEPCO II, III, IV and V, and to the administrative appellate decisions affirming them. As noted, NEPCO I is not attacked in this litigation, at least in respect of its specific result.

The scope of judicial review of the agency's orders derives from Section 211(d)(1) of the Economic Stabilization Act, 12 U.S.C. § 1904n., as incorporated into the EPA Act, 15 U.S.C. § 754(a)(1), and applicable to the FEA under the FEA Act, 15 U.S.C. § 767(f). § 211(d)(1) provides:

"[N]o order of such agency shall be enjoined or set aside, in whole or in part, unless a final judgment determines that such order is in excess of the agency's authority or is based upon findings which are not supported by substantial evidence."

█ NEPCO, complaining of the FEA's exceptions orders, bears the burden of proof to establish that those orders were "in excess of the agency's authority or based upon findings which are not supported by substantial evidence." *Powerine, supra,* at 387. *Powerine* also recites the deference accorded by the courts to the FEA in reviewing the agency's case-by-case implementation of the exceptions relief principle:

"The necessity of making 'rough accommodations' to implement and effectively administer the 'complex program necessary to deal with the petroleum industry'

has warranted 'special attention' by this court to the rule of deference when it is faced with reviewing agency action which grants or denies exception relief to parties based on a case-by-case determination of the effect of the application of agency regulations to that party. *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1404. It was emphasized in *Pasco, Inc. v. FEA, supra,* 525 F.2d at 1404, that

"Administrative decisions based upon analysis of the data and information submitted on applications for exception relief require the application of administrative expertise, and this court should not be quick to overturn them. In *Consumers Union of U. S., Inc. v. Cost of Living Council,* 491 F.2d 1396, 1403 n. 2 (Em.App.1974), cert. denied, 416 U.S. 984 [94 S.Ct. 2387, 40 L.Ed.2d 761] (1974), this court quoted from *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161 [25 L.Ed.2d 491] (1970), which stated: 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.'" *Id.* at 385–386.

In NEPCO I the FEA determined that, to qualify for exceptions relief, NEPCO must demonstrate "that the firm's ability to remain a viable independent competitor will be substantially endangered in the absence of exception relief." R. 1736. I have concluded *supra* that the FEA lawfully applied that standard of hardship to NEPCO. The decisions and orders which followed NEPCO I, denying relief or granting the company less than it asked for, reflect *au fond* the agency's evaluation of NEPCO's need, measured by that valid standard. To the extent that NEPCO complains of those orders, the question is whether it has sustained the burden of proof summarized in *Powerine.* The orders are considered *seriatim.*

NEPCO II

█ NEPCO's indictment of the FEA in respect of NEPCO II was summarized by counsel at the argument as one of "intellec-

tual bigamy." [74] NEPCO argues that, having arrived at the conclusion it did in granting relief in NEPCO I, the FEA's subsequent rulings [75] denying relief cannot be sustained. In NEPCO's view, the economic facts were "essentially the same" in August, 1975, when NEPCO II was issued, as they were in May, when NEPCO I was issued; yet NEPCO II, in its denial of relief, reaches a result contrary to NEPCO I, which granted it. NEPCO concludes that, in reaching such a contrary conclusion, NEPCO II "is arbitrary and capricious and is not supported by substantial evidence." [76] "Substantial evidence", in this context, means sufficient evidence "to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is for the jury." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951).

At the heart of the case lie the conclusions which the FEA reached with respect to the necessity of exceptions relief to NEPCO's continued existence as a domestic fuel oil marketer. In February, 1975 the company submitted certain financial data to the FEA in support of its first request for exceptions relief. On the basis of that data, the FEA concluded on May 2 that "the degree to which NEPCO was adversely affected was so severe as to place its continuing existence as a marketer of residual fuel oil *in immediate peril*." [77] Accordingly limited exceptions relief for the months of May, June and July was granted, with leave to apply for an extension of relief on updated financial data. NEPCO made such an application, submitting revised data, in July. From that data, the FEA concluded that "NEPCO's financial situation has improved to a considerable degree, even though the firm continues to incur operating losses"; and that:

". . . NEPCO's operating position has improved to the point where the firm's continued activities in the residual fuel oil market are not dependent on its receiving entitlement exception relief during the month of August." [78]

NEPCO was granted leave to apply, on further data, for relief during September.

There is no fatal inconsistency between NEPCO I and NEPCO II if the financial data available to the FEA in July furnished substantial evidence upon which the agency could conclude that the immediate need for relief, which it perceived in May on the basis of the data then before it, did not exist in July. NEPCO bears the burden of proof that no such evidence may be found in the July data.

The FEA, in essence, drew a distinction between what NEPCO *projected* in February and the actual *position* as revealed in July.[79] The FEA focused on these factors: [80]

(1) *1974 Losses.* In February, NEPCO's data indicated losses in 1974 totalling $XX million, a figure revised upwards in April to $XX.X million. In July, the data indicated a sustained loss of $XX.X million for the year.

(2) *Net Worth.* In February, NEPCO's data projected a deficit in its net worth of $XX,XXX,XXX as of December 31, 1974. In July, the data demonstrated a net worth of $XX,XXX,XXX as of June 30, 1975.

(3) *1975 Losses.* In February, NEPCO projected losses in 1975 totalling $XX million, in the absence of exception relief. In July, in the absence of *any* exception relief, that projection was reduced to $XX,XXX,XXX; and, since the exceptions

---

74. Tr. 14.

75. This argument embraces not only NEPCO II, but subsequent orders denying relief.

76. Main brief, p. 22.

77. NEPCO II, R. 2662, explaining rationale of NEPCO I (emphasis added)

78. NEPCO II, R. 2661, 2662.

79. "The data which NEPCO has submitted in connection with its present Application indicates that NEPCO's current financial position is better than the projections in the original NEPCO Application for Exception." NEPCO II, at R. 2659.

80. R. 2658–2661.

relief for March through May totalled $XX,XXX,XXX, NEPCO's projected 1975 loss, in the absence of *further* relief, was $XX,XXX,XXX. The FEA observed that "to some extent, NEPCO's improved financial condition results from decreases which the firm has experienced in the cost of the crude oil which is refined in its Bahamas refinery"; pertinent cost data appear in the decision.[81]

As to the first two of these factors, NEPCO argues here that the differences in its financial condition are more apparent than real. That is so, the argument proceeds, because the February data were based on unaudited 1974 statements, whereas by July the company's independent auditors had audited the books; and had determined, contrary to NEPCO's approach in February, that $XX million in claims against oil suppliers should be credited to 1974 operations. The company's February presentation, while listing such claims in a footnote to its unaudited 1974 income statement, made it clear that they were excluded from 1974 income. The different accounting treatment called for by the auditors was the largest single factor in transforming an unaudited 1974 loss in excess of $XX million (February data) to an audited loss for NEPCO of $XX.X million (July data).[82] The difference in accounting treatment of the $XX million in claims against suppliers brings about a comparable transformation in the company's net worth.

NEPCO argues that since it revealed to the FEA, prior to the relief it extended in May, that it was excluding these claims from its unaudited statement, their subsequent inclusion by the auditors does not bring about a present or "real" change in the company's position. It follows, the argument concludes, that at least to the extent of $XX million, the improvement the

FEA perceived in the company's position was not supported by substantial evidence, and a denial of relief based upon that perception was arbitrary and capricious.

As to the third factor, the improvement in actual and projected losses for 1975, as contrasted with the losses projected for that year in the earlier data, NEPCO recognizes that such a development took place: "The gap between costs and revenues narrowed and a loss projected at close to $XXX million at the time of the May Order became a loss projected at close to $XX million at the time of the August Order."[83] Of course, as the FEA pointed out in NEPCO II, that figure of "close to $XX million" was calculated on the basis of NEPCO having received no exceptions relief, whereas in point of fact the company had received in excess of $15 million during the first half of 1975, so that the projected 1975 loss, as of July and in the absence of any further of any exceptions relief, was somewhat in excess of $XX million. As it did with respect to the claims against suppliers considered in connection with 1974 losses and net worth, NEPCO contends that, prior to the issuance of NEPCO I, it had furnished the FEA with data from which the FEA could have observed that the actual 1975 losses would be less than originally projected. And, as it does with respect to the 1974 loss and net worth factors, NEPCO contends that the "improvements" in its condition which the FEA perceived in July are not sufficient to justify a denial of further relief. The argument is summed up in NEPCO's reply brief (p. 6): "The fatal flaw in FEA's defense is that in comparing the cataclysmic with the disastrous, FEA has declared the latter to be the equivalent of financial good health."

By analogy to the principle that the FEA must "adhere to its own announced rules",

---

**81.** R. 2660–2661.

**82.** The precise figures cited in NEPCO's main brief (pp. 27–28) do not coincide precisely with the FEA's discussion in NEPCO II, which dealt with Carey Energy Corporation, consisting of NEPCO and other companies. The NEPCO figures, as summarized in the brief, are: unaudited loss, $XX.X million; minus $XX million in

regard to claims against suppliers, credited by auditors to 1974; minus XX.X million in other adjustments (excess cost recoveries, reductions in inventory writedowns and sales price adjustments, other audit adjustments); leaving 1974 NEPCO loss of $XX.X million.

**83.** Main brief, p. 38.

*Delta Refining Co., supra*, at 1199, NEPCO's charge of "intellectual bigamy" or fatal inconsistency might be sustained if it clearly appeared that the FEA was fully cognizant, prior to the granting of relief in May, of the factors upon which relief was denied in August. That is to say, if the FEA had taken fully into consideration, prior to NEPCO I, (a) inclusion of the $XX million in claims as 1974 income and (b) the lessening gap between costs and revenues in early 1975, and then decided to grant exceptions relief, the question would arise as to how these same factors could in logic justify a denial of relief in NEPCO II. But it does not appear from a close reading of NEPCO I that the agency had this awareness. The decision refers to a demonstrated loss of $XX million for 1974 (R. 1733), and a projected loss of $XX million during 1975 (R. 1736); these are the raw, unaudited figures, calculated without regard to the subsequently emphasized factors upon which the FEA focused in NEPCO II. It follows that NEPCO I does not support the inference that the FEA took those factors into consideration in granting relief in May.

▮ It is true, as NEPCO points out, that prior to May the company had told the agency that its 1974 losses were exclusive of $XX million in claims;[84] and the FEA also had before it material which indicated lower crude oil costs in the first three months of 1975. From this material, NEPCO argues that the FEA knew *or should have known* in May of those factors which brought about a different conclusion—denial of relief—in August. However, the concept of what a party should reasonably have known, familiar enough in tort law, is not appropriate to the present context. It is apparent that, in pondering NEPCO's original submission, a massive presentation consuming 1750 pages of the record, the FEA gave no significance to these particu-

lar, lessening factors; instead it accepted NEPCO's unaudited figures, which were of course catastrophic. Perhaps the FEA should have paid closer attention to those factors. Perhaps, had it done so, the relief denied in August would have been denied in May. In a case of intellectual bigamy, the question remains: who is the bigamist? It is at least conceptually arguable that if, on a full appreciation of all factors, relief should be denied in August, it should have been denied in May.[85] But this speculation need not be pressed further. My conclusion on this aspect of the argument is that, in evaluating the consistency or inconsistency between NEPCO I and NEPCO II, the FEA should be judged by what it *knew and expressed* in NEPCO I, and not by what it perhaps *should have known* and *might have expressed*. And, judged in that light, the audited and updated data submitted in July contained significant differences from the earlier data.

I recognize that NEPCO does not concede any significance to the auditors' inclusion, in 1974 operations, of the $XX million in claims against suppliers, the contention being that this accounting treatment furnished no immediate assistance to the cash flow position or the company's relationships with its creditors. But I cannot accept the proposition that the auditors' action is of no significance whatsoever in the FEA's evaluation of NEPCO's position, so that the agency should have disregarded the factor entirely. It is apparent from NEPCO I that a powerful element moving the agency in the company's favor was a loss figure for 1974 in excess of $XX million; the FEA cannot reasonably be faulted for paying some attention to the opinion of independent auditors that $XX million in claims should be included in, and not excluded from, that immediate pre-relief period of operations. That is particularly true, in

---

**84.** In point of fact the total given in the earlier submission was $XX million; it was revised to $XX million in July. The difference is not material.

**85.** Having posed the concept, I am not persuaded by it. The FEA made it clear in NEPCO

II that the relief granted in NEPCO I was a significant factor in the company's improved condition noted in August. Had it not been for the May relief, the case for August relief would obviously have been stronger.

view of the auditors' further determination that $XX.X million of the claims in question should be treated as "current assets", while listing the balance as "other assets".[86]

Had the FEA denied relief in August solely on the basis of this change in accounting treatment, the argument would have more substance. But it is apparent from NEPCO II that other considerations were present: namely, the improved loss projections for 1975, and the improvement in the company's condition brought about by the relief generated by NEPCO I.

 In the light of all these factors, the FEA concluded that, as of the end of July, the company did not require further exceptions relief to forestall an imminent danger of collapse. I find that this conclusion was supported by substantial evidence, and was not arbitrary or capricious. I am mindful of NEPCO's argument that it was still losing money. The FEA itself expressly recognized that fact; but under the standard of hardship lawfully applied by the agency to NEPCO, the FEA did not undertake to eliminate operating losses, or even to reduce them beyond a particular point. The FEA's sole criterion, in granting or withholding relief as of a given moment in time, was to avoid the imminent demise of NEPCO as a domestic marketer. I decline to substitute the Court's judgment for that of the agency and rule that exceptions relief was necessary for that limited purpose in August of 1975, the agency having concluded that it was not.

One additional contention by NEPCO should be considered. The company points out that, in NEPCO I, the FEA recognized the volatile market situation in the eastern United States, and went on to observe: " . . . that further study is warranted with respect to the impact on the entire competitive situation as a result of the benefits which Amerada Hess presently enjoys. That study will be initiated immediately. Consequently, the exception relief which has been approved for NEPCO is limited in duration to no more than three months." R. 1738.

NEPCO perceives, in that language, implications that the FEA would complete its study and formulate recommendations within three months; and that it was arbitrary and capricious in August, when no such study had been completed, to deny NEPCO further relief without making any reference to the study or its relevance to the FEA's response to NEPCO's further request.

 There is no basis in this language for disapproving the agency's action in NEPCO II. The quoted language cannot be interpreted as a commitment by the FEA to continue relief to NEPCO beyond the original three months if the study had not been completed within that time. NEPCO's brief does not quite push the argument that far; but it is the only argument which would bring about the desired result, and I would not conclude that the agency was locked in to a continuing obligation to furnish relief for as long as was necessary to complete the study and implement its recommendations. On the contrary, NEPCO I makes it clear that relief beyond July was conditioned upon the submission by NEPCO of further and updated financial data. R. 1741–1742. It was on the basis of this data, as we have seen, that an extension of relief in August was denied. The reference in NEPCO I to the need for a study reflects no more than the agency's growing recognition of the particular problems affecting the east coast market; these problems were repeatedly stressed by the other parties who appeared at the public hearing in July to oppose the extension of relief to NEPCO. These parties, including other marketers, terminal operators, and industry associations, consistently advanced two themes: the Amerada Hess advantage was unfair to everyone; and the proper solution lay in doing away with that advantage, rather than giving relief to only one marketer, namely, NEPCO. As noted at page 1286 supra, the FEA responded to the first of these themes by amending the entitlements program, in April of 1976, so as to dispose

86. R. 2136, 2145.

of the problem. To be sure, the study and remedial action required eleven months, rather than three; but I do not regard that time span as unconscionable for the bureaucracy, and in any event the reference in NEPCO I to the study does not imply that NEPCO would continue to receive relief until the study had been completed, without regard to what updated financial data might show.

For these reasons, NEPCO's challenge to NEPCO II is rejected.

## NEPCO III

No extended discussion is required in respect of NEPCO III. That decision and order dealt with the company's application for exceptions relief during the month of September, 1975. The agency denied the application because the additional financial data submitted indicated that NEPCO's operating posture was not "markedly different" from that described in NEPCO II. Consequently, as in NEPCO II, the company had not demonstrated that "the firm's continued activities in the residual fuel oil market are dependent upon the approval of exceptions relief for the month of September."

In this litigation, NEPCO agrees that the position was the same at the end of August as it was at the end of July. It argues that, because NEPCO II was erroneous, it necessarily follows that NEPCO III, based upon an erroneous order, also cannot stand. The Court having concluded that NEPCO II was not wrongly decided, it follows with equal necessity that NEPCO III must stand; and the challenge to it is also rejected.

## NEPCO IV

NEPCO next applied for exceptions relief on October 9, 1975. The application was for relief commencing with the month of October, and extending "for an additional period of time" of unspecified duration.[87] NEPCO

made a powerful showing of fiscal crisis. On the basis of two more months' actual experience, the projected loss for 1975 had risen by $XX million to $XX million (exclusive of exceptions relief).[88] More significant to the "immediate danger" test applied by the FEA in NEPCO I and thereafter, the company faced a cash flow crisis projected to peak in mid-November; in a supplemental submission on October 31, with attached daily schedules of cash obligations and receipts, the company demonstrated "a cash shortage which places it on the brink of going out of business"; in a further supplemental submission on November 6 NEPCO advised the FEA that the increasing credit demands of its suppliers (perhaps inspired by an unfavorable New York Times article) forced the company to take "an even graver view of its future" than previously expressed.[89] The removal by the FEA of a 60¢ per barrel supplemental fee on petroleum products, NEPCO argued, would not assist it sufficiently.

After soliciting written comments from other interested parties, which, as usual, opposed any relief to NEPCO, the FEA in NEPCO IV found that, on the basis of the most recent submissions, "the firm's financial position has deteriorated." Stressing the cash flow problem, the agency observed that "a review of NEPCO's balance sheet as of September 30 indicates that the firm's continued existence is in very serious jeopardy"; the FEA further stated:

"The cash flow data which NEPCO has provided indicates that NEPCO's cash obligations will substantially exceed its anticipated cash receipts in the immediate future and the firm will have accrued a cash deficient of $XX million by mid-November."

The agency summarized the cash crisis as follows:

"NEPCO's current financial position is considerably worse than it was when the firm filed its July 10 and August 22 exception applications. Although NEPCO

---

87. R. 2824.

88. R. 2830.

89. R. 2830, 2864, 2924–2925.

has been experiencing operating losses for some time, it has until recently been able to obtain sufficient funds to meet its immediate obligations. However, NEPCO has now virtually exhausted its sources of credit and its sources of cash are not sufficient to permit it to meet all of its obligations. NEPCO has already reduced its inventories by $XXX million during the first nine months of this year and will be unable to rebuild its inventories and continue supplying its customers in its present situation."

The FEA concluded that this new material: ". . . demonstrates that a strong possibility exists that NEPCO will be forced to terminate its activities in the residual fuel oil market in the absence of exception relief." R. 2932–2933.

In these circumstances, the FEA determined that the NEPCO I criterion had been satisfied. Observing that the President and the Congress were then engaged in reviewing the nation's energy policies and programs, the FEA determined to grant exception relief to NEPCO which "will permit the firm to continue to operate as a viable, competitive force in the residual fuel oil market while the nation's energy policies are under consideration." That purpose, the agency concluded, would best be accomplished "by temporarily extending the exception relief which was granted to NEPCO on May 2, 1975 for the month of November." R. 2933.

On the administrative appeal, NEPCO argued that the relief should have commenced in October. The administrative appeal was rejected, the FEA focusing again upon the limited purpose of the exceptions relief granted to NEPCO (see quotation from NEPCO IV appeal decision, at p. 1292 *supra*). The NEPCO IV appeal decision expresses the NEPCO I "immediate danger" or "tombstone" test in terms of cash flow:

"In considering the firm's submission, the FEA found that NEPCO's retained earnings, cash and current ratio had decreased and that its cash obligations would soon exceed its anticipated cash receipts. The FEA concluded that a strong possibility existed that NEPCO would be forced to terminate its residual fuel oil marketing activities." R.2978.

Limitation of relief to the month of November was affirmed, on the basis of the limited purpose of granting relief to the company.

NEPCO urges that it was arbitrary and capricious for the FEA to deny relief for October. Since under the regulatory machinery October, 1975 entitlements issuances related to August, 1975 refinery runs, NEPCO focuses upon its condition at the end of August, and argues it was just as serious as the condition at the end of September. The FEA's duty, as NEPCO envisions it, was "to fashion a method of relief to remedy NEPCO's harm commencing with the month with respect to which the need for relief was first established, i. e., August 1975";[90] the company points out that its August loss of $X.X million was almost three times the size of the July loss of $X.X million.

This analysis misses the point that the particular "harm" the FEA had determined in NEPCO I to address related to the imminent danger of cessation of operation, and not operating losses. Thus the invalidity of the agency's refusal to grant October entitlements does not flow automatically from worsening losses in August; it was only when those losses threatened an imminent going out of business that the FEA was obliged, consistent with NEPCO I principles, to respond with limited relief. The FEA concluded, on the basis of NEPCO's own presentations in October, that the cash and credit really might run out in November, thereby defeating the one objective the agency had consistently proclaimed: the preservation, during the interim, pre-reform period, of NEPCO as a functioning, albeit non-profitable, domestic marketer.

In these circumstances, I perceive no arbitrary or capricious inconsistency be-

**90.** Main brief, at p. 48.

tween a grant of exceptions relief for November but its denial in respect of October. Consequently the challenge to NEPCO IV is rejected.[91]

## NEPCO V

NEPCO filed its next, and final, application for exceptions relief on December 3, 1975. The company asked for relief commencing with December, 1975 entitlements, with the further request that the entitlements be measured by the actual number of barrels sold per month, rather than limited to three million barrels. The FEA's request for industry comments produced the customary broadside of opposition, in writing and at a public hearing.

Post-November relief had also played a part in NEPCO IV. It will be recalled that in its October submission, the company asked for relief beginning with that month and for an unspecified number of succeeding months. When in NEPCO IV the FEA limited relief to November, NEPCO in its administrative appeal from that order complained of the denial of relief for December 1975 and January 1976, as well as the denial for October 1975 discussed *supra*. The FEA issued its appeal decision from NEPCO IV on February 17, 1976. During the pendency of that appeal, the company had requested relief beginning with December in the December 3 application which was to culminate in NEPCO V; accordingly, the appeal decision in NEPCO IV did not consider those months, the agency concluding that:

". . . it would be more appropriate for the FEA to consider whether exception relief is warranted for the months of December and January in the context of that proceeding." R. 2980.

The phrasing of this February 17, 1976 pronouncement in NEPCO IV is somewhat peculiar. One would assume, from the language just quoted, that NEPCO's request for December and January relief was still pending "in the context of that [other] proceeding", namely, NEPCO V; hence the justification for the failure to address those two months in the administrative appeal from NEPCO IV. In point of fact, however, on February 12, 1976, *five days prior* to the appeal decision in NEPCO IV, the FEA *had decided* NEPCO V.[92] The agency granted relief for the months of February and March, 1976. The practical effect of that order was to leave NEPCO without relief for December and January; and yet the initial order in NEPCO V, *does not even discuss exceptions relief for these two months.*

At this point NEPCO cries "Catch-22". Consider the sequence. The initial order in NEPCO IV, rejecting the company's claim for a longer period of relief, limited it to November. The NEPCO IV appeals decision refused to deal with the company's claims for December and January, for the stated reason that those claims would be considered within the context of NEPCO V. However, NEPCO V, decided in mid-February, and granting an immediate resumption of relief for February and March, says nothing at all about the claims in respect of December and January.

The question that arises is whether, instead of a "lost weekend", we are presented with two "lost months", December 1975 and January 1976; months which, in view of the lead time between application and decision, and the interaction of NEPCO IV and V, were simply never dealt with fairly and adequately by the FEA.

The FEA says that is not so. When the NEPCO V administrative appeal was decided on June 29, 1976,[93] long after the Amerada Hess root problem had been laid to rest by the April amendments, the agency explains the failure to NEPCO V to discuss

**91.** NEPCO also challenges the FEA's failure, in NEPCO IV, to provide relief for December 1975 and January 1976. I conclude that, on the basis of the record in mid-November, when NEPCO IV was decided, the order may stand. However, NEPCO also challenges the failure of NEPCO V, decided in mid-February, to grant

relief for those two months. In the context of NEPCO V, quite different considerations arise; see pp. 1315–1317, *infra*.

**92.** R. 3522–3531.

**93.** R. 3597–3605.

December or January relief on the basis that:

"Implicit in the February 12 Order was the determination that it was not necessary to extend that relief two months into the past (to December and January) in order to ensure that Nepco would remain viable for the two months in the immediate future before the anticipated effects of the rulemaking procedure would be felt in the marketplace." R. 3603.

The company's appeal was rejected because it:

". . . does not contain any substantive evidence or arguments which refute the determination implicit in the February 12 Order that exception relief which would have enabled Nepco to sell entitlements in the months of December and January are not warranted under the circumstances." *Ibid.*

I find this *apologia* to be entirely unconvincing. A close reading of the initial NEPCO V decision reveals that the FEA, assessing the company's position in mid-February, concluded that the patient was still in near-terminal condition, and ordered an instant resumption of transfusions. The agency observed: "A review of NEPCO's balance sheet as of December 31, 1975 indicates that the firm's economic inability continues to be in very serious jeopardy." R. 3525. In a perhaps understandable preoccupation with the crisis of the moment, the FEA quite simply did not address the question of whether, by its own NEPCO I standard of hardship, the company was also entitled to relief for December and January. The NEPCO V appeals decision's perception, in mid-July, of an "implicit" determination that such relief was not necessary is born of wishful thinking.[94]

The reason why the FEA did not grant relief beyond November in NEPCO IV emerges from NEPCO V: the agency had anticipated, in connection with its grant of November relief, that:

". . . during the period for which relief was approved, we would have an opportunity to consider the manner in which the Energy Policy and Conservation Act (EPCA) would affect the East Coast market for residual fuel oil. We also expected that the FEA would address in a comprehensive fashion the issues raised by NEPCO in its exception applications and by other firms which operate in the same market." R. 3527.

These expectations having failed to bear fruit by mid-February, the agency was again presented by NEPCO in a critical condition. But it is clear that the merits of the claims for December and January were lost in the shuffle.

In consequence, for the first time in these proceedings NEPCO is not challenging a well-reasoned, articulated and comprehensible agency decision. Rather, the company challenges a result based upon unarticulated reasons, and which NEPCO contends cannot rationally be squared with the conditions and events of the pertinent times. I conclude that NEPCO is correct in these last challenges, and that the FEA's denials of exceptions relief for December, 1975 and January, 1976 were arbitrary, capricious and not supported by substantial evidence.

The FEA argues in its briefs that the propriety of its actions is conclusively demonstrated by NEPCO's continued commercial existence. The agency's limited purpose was to insure that existence; NEPCO survived; therefore the allocation of relief was entirely proper—Q.E.D. While there is an initial appeal to that argument, which indeed supports affirmation of the FEA's earlier actions, the argument when taken to its logical conclusion would require NEPCO to collapse into bankruptcy as a condition precedent to demonstrating the FEA's departure from the pertinent standard of hardship. This can neither be good law nor

94. A Marx Brothers routine comes to mind: GROUCHO (in the role of a detective): "It is my belief that the stolen picture is in the house next door."

CHICO: "But there is no house next door." GROUCHO: "Then we'll build one."

common sense. The validity of NEPCO V's refusal to grant exceptions relief for December, 1975 and January, 1976 must be measured by the question of whether there is substantial evidence, given the company's condition at these times, to justify a refusal of relief in these two months, preceded as they were by relief in November and a resumption of relief in February and March.

I conclude that this question must be answered in the negative. The situation is quite different from those which pertained earlier. In August of 1975, the combined effect of three months' exceptions relief, reduced operating costs, and audited figures was to make it impossible for NEPCO to demonstrate that degree of imminent danger which had justified the initial relief in May. That condition of imminent danger did not arise again until mid-November; such sequence of events affords rational bases both for the withholding of relief in August, September and October, 1975 and its resumption in November. However, when one contrasts NEPCO's situation as depicted in the original NEPCO IV decision of November 17, 1975, with that depicted in the initial NEPCO V decision of February 12, 1976, no distinguishing factor emerges which would explain the difference in treatment. In NEPCO IV, the FEA recited that as of September 30, 1975, current liabilities exceeded liquid assets by $XXX million; the current ratio was X.XX to X; and the working capital deficit was $XXX million.[95] In NEPCO V, the FEA found that these figures had worsened to $XXX million, .XX to X, and $XXX million respectively.[96] Against this pattern, it is difficult to visualize an improvement in the company's position which justified a cessation of relief in December if relief was justified in November. And the task becomes even more difficult when one contemplates the FEA's observation in NEPCO V, amply supported by the evidence:

"The information submitted by NEPCO demonstrates that NEPCO's financial position has deteriorated substantially since the Decision and Order issued to the firm by the FEA on November 17, 1975. *See NEPCO IV, supra.* That material also shows that, in the absence of exception relief, NEPCO will likely be forced to terminate its activities as a viable competitor in the residual fuel oil market." R. 3526.

For these reasons, I conclude that the FEA's failure to grant relief for December and January cannot stand.

I reject, however, NEPCO's contention that the relief granted in respect of February and March should have been on the basis of all imports of residual fuel oil sold in a given month, rather than limited to three million barrels. The company's argument in favor of this additional relief was based on a presumption that the FEA intended to extend to NEPCO an identical cost reduction enjoyed by Hess under the entitlements program. The FEA appeals decision properly rejected that argument, in view of the limited purpose of relief being extended to NEPCO.[97]

## VI

### FURTHER PROCEEDINGS

NEPCO urges that, to the extent it prevails in the litigation, the Court should enter an order declaring the challenged orders void and without effect, and "reinstating" the relief previously afforded (but "arbitrarily withheld by the challenged orders") in an amount "at least equal to $5.3 million per month for the months of August, September, October, and December, 1975, and January, 1976." [98]

The FEA contends that if any of the orders are invalidated, the Court's proper function is to remand the case to the agency.

---

**95.** R. 2932.

**96.** R. 3525.

**97.** R. 3602–3603.

**98.** Reply brief, at p. 42.

 For the reasons stated, I have concluded that NEPCO V, to the extent that it denied relief for the months of December 1975 and January 1976, is invalid. However, I have no confidence in my ability to set forth, in the form of a judgment, the precise dollar amounts of NEPCO's consequent entitlements.[99] The better course is to remand the case to the Department of Energy, statutory successor to the FEA,[100] for further proceedings consistent with this opinion. *NLRB v. Food Store Employees Union,* 417 U.S. 1, 10, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974).

## VII

### CONCLUSION

The Court has considered all arguments put forward by counsel in their exhaustive and able briefs. To the extent those arguments are not discussed *supra,* they are rejected.

The Court's rulings on the cross motions are summarized as follows:

1. Plaintiff NEPCO's motion for summary judgment on its Eleventh Claim for Relief is granted, to the extent that it complains of the FEA's failure to grant exceptions relief for the months of December 1975 and January 1976. The measure of relief is limited to 3,000,000 barrels per month.

2. The Federal defendants' motion to dismiss all other claims for relief put forward by plaintiff is granted.

3. The motion of intervenor-defendant Exxon for summary judgment dismissing the complaint is denied.

4. The case is remanded to the Department of Energy for further proceedings consistent with this opinion.

5. The materials submitted under seal, which the Court has examined in the determination of these motions, will be resealed subject to further Court order.

Counsel for NEPCO are directed to settle a judgment and order consistent with this opinion on five (5) days' notice, the date of settlement to be not later than fourteen (14) days from the filing of this opinion.

It is So Ordered.

---

99. The considerably different amounts awarded for each of the five months in respect of which relief was granted are sufficiently inhibiting in themselves. See FEA main brief, at p. 6 n.2.

100. See Department of Energy Organization Act, P.L. 95–91, 91 Stat. 565, effective October 1, 1977; Exec. Order No. 12009, 42 F.R. 46267, September 13, 1977.